IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| **RON HUNT** | : |
| Plaintiff, | : Civil Action No: L02-CV-252 |
|  | : (WDQ) |
| v. | : |
| **TRACEY'S INC. t/a** | : |
| **RITZ CABARET** | : |
| and | : |
| **FRANCIS LEE** | : |
| Defendants. | : |

## PLAINTIFF'S AMENDED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

COMES NOW Plaintiff Ron Hunt, by and through counsel Jimmy A. Bell, Esq. and the Law Office of Jimmy A. Bell, P.C., and respectfully submits this Amended Opposition to Defendants' Motion to Dismiss Amended Complaint.

Plaintiff's arguments will be more fully set forth in the accompanying Memorandum of Points and Authorities.

Respectfully submitted,

_____
Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, MD 20772
(301) 599-7620
(301) 599-7623 (fax)
Counsel for Plaintiff
Bar No. 14639

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **RON HUNT** | : |
| Plaintiff, | : Civil Action No: L02-CV-252 (WDQ) |
| v. | : |
| **TRACEY'S INC. t/a RITZ CABARET** | : |
| and | : |
| **FRANCIS LEE** | : |
| Defendants. | : |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S AMENDED OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

COMES NOW Plaintiff Ron Hunt, by and through counsel Jimmy A. Bell, Esq. and the Law Office of Jimmy A. Bell, P.C., and respectfully submits this Memorandum of Points and Authorities in Support of Plaintiff's Amended Opposition to Defendants' Motion to Dismiss Amended Complaint.

For cause, Plaintiff states the following:

**STATEMENT OF FACTS**

Plaintiff Ron Hunt is an African-American citizen of the United States and the owner of the Nexus Gold Club, the largest gentleman's club on the east coast. From February of 2002 to May of 2002, Plaintiff Ron Hunt met with Defendant Francis Lee and his agent, Joerg Eichelberger, numerous times in order to discuss the purchase of the Ritz Cabaret by the Plaintiff. Plaintiff Hunt also submitted written offers to the

Defendant for the purchase of the Ritz Cabaret. Mr. Eichelberger specifically told Plaintiff Hunt no contingencies, including financing, would be accepted and that Plaintiff would have to pay $1.6 million to purchase the Ritz Cabaret in addition to a six percent (6%) buyer's fee. However, on May 22, 2002, Defendant Lee entered into a Contract of Sale with a non-African American purchaser which indeed contained contingencies and which did not include any provision for paying an additional six percent (6%) buyer's fee.

Defendant Lee not only discriminated against Plaintiff Hunt contractually, but also defamed Plaintiff Hunt to the employees of the Ritz Cabaret following Plaintiff Hunt's visits to the Defendant's establishment between February and May of 2002.

## ARGUMENT

**I.    JURISDICTION**

As a preliminary matter, Plaintiff Ron Hunt is indeed invoking federal question jurisdiction under 28 U.S.C. § 1331. This Court has original jurisdiction of the claims in Plaintiff's Amended Complaint as the Plaintiff is contending that Defendant Lee violated his civil rights under 28 U.S.C. § 1981 and §1982.

In the alternative, as Defendant Francis Lee is currently an inmate at Morgantown Federal Correctional Institution in Morgantown, West Virginia, and Plaintiff Ron Hunt currently resides at 1200 Golf Course Drive in Mitchellville, Maryland, and the matter in controversy is ten million dollars ($10,000,000.00), diversity of citizenship has been established under 28 U.S.C. § 1332.

II.   **STANDARDS FOR DISMISSAL**

The Supreme Court recently held that a heightened pleading standard shall not be applied to discrimination cases. *Swierkiewicz v. Sorema*, 122 S. Ct. 992, 998 (2002). According to the Supreme Court, Plaintiff Hunt need only provide a  short and plain statement of the claim showing that [he] is entitled to relief." *Id., quoting, Fed. R. Civ. P. 8(a)(2)*. This Court may dismiss Plaintiff Hunt s Complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the stated allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). Plaintiff Hunt s factual allegations must be accepted as true. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993). Finally, Plaintiff Hunt is entitled to all the favorable inferences which can be drawn from his allegations. *Warth v. Seldon*, 422 U.S. 490, 501 (1975). As Plaintiff Hunt has provided this Court and the Defendant with a short and plain statement of his claims showing that he is entitled to relief, and as it is not clear that no relief could be granted under any set of facts that could be proved consistent with the stated allegations, this Court may not properly dismiss Plaintiff Hunt's Complaint.

III.   **THE CONTRACT OF SALE SIGNED BY DEFENDANT LEE ON MAY 22, 2002, REFUTES DEFENSE COUNSEL'S CONTENTIONS THAT DEFENDANT LEE WAS PRECLUDED BY THE APRIL 10, 2002, PRELIMINARY FORFEITURE ORDER FROM ENTERING INTO A CONTRACT FOR THE SALE OF THE RITZ CABARET.**

In the Motion to Dismiss Amended Complaint, Defense Counsel stated that Defendant Lee did not own the Ritz Cabaret in May 2002 and therefore "lacked the capacity to enter a binding contract to sell the property to anyone." Page 8. Defense Counsel further stated: "The club, its underlying real estate (504 S. Broadway, Baltimore,

3

MD), and the liquor and adult entertainment licenses were forfeited to the United States government on April 10, 2002. See Preliminary Order of Forfeiture in *United States v. Francis Lee*, Crim. No. S-01-0232 (attached)." Page 5. Defense Counsel made the argument that Defendant Lee lacked the capacity to enter into a binding contract for the sale of the Ritz Cabaret without any supporting affidavit from Defendant Lee. As Plaintiff Hunt was told by both Defendant Lee and his agent, Joerg Eichelberger, that the government was allowing Defendant Lee to sell the Ritz Cabaret (*see generally Exhibit A,* Affidavit of Ron Hunt), this Plaintiff believes that he is entitled to take the deposition of Defendant Lee to ascertain the truth behind these contradictory statements.

In describing Defendant Lee's representation of his capacity to enter into a binding contract to sell the Ritz Cabaret, Plaintiff Hunt states:

> I, Ron Hunt, of 1200 Golf Course Drive, Mitchellville, Maryland 20721, being duly sworn state the following regarding my experiences with Francis Lee. I initiated communications with Mr. Lee and Joerg Eichelberger, Mr. Lee's agent, concerning the purchase of the Ritz Cabaret and all of it's [sic] licenses in February of 2002. I had a closed door face to face meeting with Mr. Lee in February 2002. I also met with Mr. Lee and Mr. Eichelberger together approximately three times Between [sic] February 2002 and May 2002. On those occasions I met with Mr. Lee and Mr. Eichelberger at the Ritz Cabaret in Baltimore, and on one occasion I met with Mr. Lee and Mr. Eichelberger at my place of business, the Nexus Gold Club in Washington, D.C. During each meeting we discussed the price, and terms of sale, for the Ritz Cabaret and all of its licenses. Additionally, I submitted my offers in writing to Mr. Lee's agent.
>
> In response to my inquiries concerning the purchase of the Ritz Cabaret and all of it's [sic] licenses, Mr. Lee revealed to me that he had federal criminal legal problems. Mr. Lee stated that the federal government was allowing him to sell the Ritz Cabaret in order to settle his debts. Mr. Stated that if he did not sell it himself, the government

4

>would sell it and he would loose [sic] money. Mr. Lee did not disclose the name of who the federal government official who was authorizing him to sell the Ritz Cabaret and all of its licenses. At no time did Mr. Lee or his agent indicate that Mr. Lee was not in a position to enter into a contract for the sale of the Ritz Cabaret. In fact, on May 22, 2002, Mr. Lee entered into a signed Contract of Sale with Philip Bast Gagne and Dennis Alviani, which purported to transfer ownership of the Ritz Cabaret to those named individuals. This contract was even filed with the Baltimore City Liquor Board, for the purpose of commencing the license transfer process. *Exhibit A*, Affidavit of Ron Hunt.

If Defense Counsel's statements concerning Defendant Lee's lack of capacity are indeed true, the Plaintiff in the instant matter will petition this Court to further amend his Amended Complaint to include a count of fraud.

In addition, the Contract of Sale entered into between Defendant Lee, Philip Bast Gagne and Dennis Alviani on May 22, 2002 for $300,000.00, which purports to transfer ownership of the Ritz Cabaret from Defendant Lee to Gagne and Alviani, contradicts Defense Counsel's statements. This Contract specifically stated: "Seller agrees to sell to Buyer and Buyer agrees to buy from Seller a parcel of improved real estate located in Baltimore City, Maryland and known as 504 S Baltimore Street, Baltimore, Maryland 21231 ("the Property") upon the terms and conditions set forth in this Agreement." *Exhibit B*, Contract of Sale. Defendant Lee entered into yet another contract on May 22, 2002, an Agreement of Sale of Assets for $1,300,000.00, in his capacity as President of Tracey, Inc., between Tracey, Inc., Gagne and Alviani. This second contract specifically stated:

>Seller hereby bargains and sells unto Buyer and the latter does hereby purchase from the former, the aforementioned business, free from all liabilities, debts, mortgages, security interests, liens, and encumbrances whatsoever, and all of

5

> Seller's rights, title and interests in the business conducted on the premises, including, but not limited to the existing alcoholic beverage license, the existing entertainment license, all equipment and fixtures, an itemized list of which is attached hereto and a part hereof as Schedule A, the goodwill, all customer contracts, all advertising contracts, the stock, inventory, existing telephone numbers, signs, the right to continue to trade on the premises under any trade name now used by the Sellers and all other assets of whatsoever nature pertaining to the business. *Exhibit C*, Agreement of Sale of Assets.

These May 22nd contracts were clearly entered into by Defendant Lee **after** the Preliminary Forfeiture Order was entered on April 10, 2002. This lends credence to Plaintiff Hunt's statements that Defendant Lee informed him that he had been given special permission by the United States government to sell the Ritz Cabaret to pay his debts, and that Defendant Lee indeed had an agreement with the federal government to sell the Ritz Cabaret. *See generally Exhibit A*, Affidavit of Ron Hunt. The May 22, 2002 contracts further suggest that the Preliminary Forfeiture Order was simply "preliminary" as the title of the Order and the fact that a Final Forfeiture Order (*see generally Exhibit D,* Final Forfeiture Order) was not entered until August 30, 2002 both suggest.

Moreover, Plaintiff Hunt communicated with Defendant Lee and Defendant's agent/realtor, Joerg Eichelberger, numerous times between the months of February 2002 to May 2002, for the sole purpose of inquiring about the purchase of the Ritz Cabaret. Plaintiff Hunt also made several offers to purchase the Ritz Cabaret. On April 4, 2002, the letter from Plaintiff Hunt's attorney to Mr. Eichelberger stated: "Please be advised that my client has authorized me to make an offer of $1.5 million dollars for the property referenced above." *Exhibit E*, Letter from Jimmy A. Bell, Esq. to Joerg Eichelberger dated April 4, 2002. In response to Plaintiff Hunt's offer, Mr. Eichelberger stated:

6

> Thank you for the offer you made for the Ritz Cabaret yesterday via Fax. The offer was declined by the seller. Like I told you the only reason we [sic] still talking with the prospective buyer's [sic] is, because of the offer that was accepted has a contingency of financing. The seller will entertain other cash offers, of the prospective buyer is willing and able to close the deal within a reasonable time. There is a 6% (Six per cent) buyers fee (Commission) added to the purchasing price. If you and your buyer is [sic] still interested in negotiating, I would suggest a meeting with you, the buyer and myself.
>
> FYI: The seller has the authorization to sell the business and the property, including all of the Licenses, we have to submit the offer to the Fed's for the final approval, who in turn will release the liens that they have at this time.
> *Exhibit F*, Letter from Joerg Eichelberger to Jimmy A. Bell, Esq. dated April 5, 2002.

Mr. Eichelberger's own words lend further credence to Plaintiff Hunt's statements that Defendant Lee had been given special permission by the United States government to sell the Ritz Cabaret to pay his debts. *See generally Exhibit A*, Affidavit of Ron Hunt. *It* also verifies Plaintiff Hunt's claims that he was subjected to additional terms, such as a six percent buyer's premium, which the non-African American purchaser of the Ritz Cabaret was not subjected to in the May 22, 2002 contract. *Id.*

On May 22, 2002, Plaintiff Hunt contacted Mr. Eichelberger via his attorney to request specific information about the Ritz Cabaret to provide to his bank for financing purposes. *See Exhibit G*, Letter from Jimmy A. Bell, Esq. to Joerg Eichelberger dated May 22, 2002. In response to this letter, Mr. Eichelberger stated:

> Since the Federal Government has seized the Ritz and all of the records there is nothing that we can provide you with, that would help your client to obtain financing from a bank. The way it works is the same as I told you before, any legit contract is forwarded to the Federal Government, they will investigate the person or group to see if there [sic] are qualified to purchase the Ritz. No contingencies are

7

>accepted especially financing. Its basically like a auction, the best party qualified wins the bid. Plus there is a 6% buyer premium added to the purchase price payable to: Joerg Eichelberger/Realtor, Att: Melvin Kodenski, Esq., 19 East Fayette Street, Baltimore, MD. 21202…Since Mr. Lee is temporarily under medical care (2 weeks) and the federal Government is not interested in running the Club, Lee's business partner is managing the Club with our help and 2 Managers. *Exhibit H*, Letter from Joerg Eichelberger to Jimmy A. Bell, Esq. dated May 28, 2002.

Again, Mr. Eichelberger's own words lend credence to Plaintiff Hunt's statements that Defendant Lee had been given special permission by the United States government to sell the Ritz Cabaret to pay his debts. *See generally Exhibit A,* Affidavit of Ron Hunt. It also verifies Plaintiff Hunt's claims that he was subjected to additional terms, such as a six percent buyer's premium and the disallowance of a contingency, which the non-African American purchaser of the Ritz Cabaret was not subjected to in the May 22, 2002 contracts. *Id.*

On June 7, 2002, Plaintiff Hunt made another offer to Defendant Lee for the purchase of the Ritz Cabaret. The letter detailing this offer stated: "Please be advised that my client has authorized me to make an offer of $1.6 million dollars for the Ritz Cabaret located at 504 South Broadway in Baltimore, Maryland." *Exhibit I*, Letter from Jimmy A. Bell, Esq. to Joerg Eichelberger dated June 7, 2002. In response to this letter, Mr. Eichelberger stated:

>The feds approved the management group the [sic] Lee was dealing with over the last few month's [sic], as you can see in this mornings Sun Paper, Maryland section page 5B, they advertise the transfer of the Liquor License on 504 S. Broadway.
>
>Since we never know that any deal goes thru, until the check clears, I will forward your clients offer, but first you have to make a change. I informed you before, any offer

8

>that's made you have to add a Six per cent (6%) buyers premium. Please make you [sic] change and fax it to me and send a hard copy to me by mail. *Exhibit J*, Letter from Joerg Eichelberger to Jimmy A. Bell, Esq. dated June 8, 2002.

Upon being notified by Defendant Lee and Mr. Eichelberger that offers to purchase the Ritz Cabaret would not be considered minus a six percent buyer's premium, a provision which the non-African American purchaser of the Ritz Cabaret was not subjected to, Plaintiff Hunt's attorney sent a letter to Mr. Eichelberger, stating: "Please be advised that my client has authorized me to make an offer of $1.6 million dollars plus a six percent (6%) buyer's premium for the Ritz Cabaret located at 504 South Broadway in Baltimore, Maryland. *Exhibit K*, Letter from Jimmy A. Bell, Esq. to Joerg Eichelberger dated June 13, 2002. In response to Plaintiff Hunt's offer, Mr. Eichelberger stated:

>I took your offer to Linda Lee Buck, who at this time is appointed, and has the Power of Attorney to handle any of Francis Lee [sic] business matters.
>
>You can reach Linda Lee Buck by phone at the Ritz (410) 327-0853 or at her cell phone (410) 230-5026 or by Fax at (410)-238-7554. The offer from the other Group that is in at this time and who attempted to transfer the Liquor License without the seller's signature is in limbo at this time, we withdrew the application of the transfer, and waiting for the next step. Hopefully the attorney is able to void the signed contract. Since I'm going to be away to recuperate from my operation on my Spine, I won't be able to assist you, just work with Linda Lee Buck and the Attorney she will use in this matter. If the deal goes thru the buyers premium needs to be sent to Melvin Kodenski, 19 East Fayette Street, Baltimore, Md. 21202, he represents me on all my pending, [sic] settlements's [sic]. *Exhibit L*, Letter from Joerg Eichelberger to Jimmy A. Bell, Esq. dated June 15, 2002.

Again, Mr. Eichelberger's own words verify Plaintiff Hunt's claims that he was subjected to additional terms, such as a six percent buyer's premium, which the non-African

9

American purchaser of the Ritz Cabaret was not subjected to in the May 22, 2002 contract. *See generally Exhibit A,* Affidavit of Ron Hunt.

At no time did Defendant Lee or Mr. Eichelberger inform Plaintiff Hunt that Defendant Lee lacked the capacity to enter into a binding contract to sell the Ritz Cabaret. In fact, the words and representations of both Defendant Lee and his agent, Mr. Eichelbeger, plainly suggest that Defendant Lee was given special permission by the Federal Government to sell the Ritz Cabaret. As Defendant Lee's capacity to enter into a binding contract to sell the Ritz Cabaret is clearly in question, the parties in this action should be allowed to conduct discovery in order to determine the true nature of the agreement between Defendant Lee and the Federal Government. It is crucial to Plaintiff Hunt's claims that he be allowed to ascertain the specific government agency which purportedly gave Defendant Lee permission to sell the Ritz Cabaret in order to settle his debts and the individual who communicated this information to Defendant.

IV. **DEFENDANT LEE'S FALSE STATEMENTS TO THIRD PARTIES CONCERNING PLAINTIFF RON HUNT CONSTITUTE DEFAMATION UNDER MARYLAND LAW.**

Defendant Lee not only discriminated against Plaintiff Hunt contractually, but also defamed Plaintiff Hunt to the employees of the Ritz Cabaret following Plaintiff Hunt's visits to the Defendant's establishment between February and May of 2002. Defendant Lee stated that "he didn't want to sell the club to Ron [Hunt] because he was too arrogant and he was always throwing his money around," and that Plaintiff Hunt would "treat his girls bad" and that he would also "bring the club down." *Exhibit M,* Affidavit of Nicole Fuoco. Defendant Lee also stated that Plaintiff Hunt "would never be able to keep the club in the condition that it was in and that Mr. Hunt would not be able

10

to keep the club up and running" and that he would "bring in a lower class of clientele."

*Exhibit N,* Affidavit of Megan Mattson.

Defendant Lee's specific defamatory statements are detailed as follows:

> I, Nicole Fuoco of 365 Montocello Court, Glen Burnie, 21061 being duly sworn state the following regarding my experiences as Bartender at the Ritz Cabaret of Baltimore, Maryland and my knowledge regarding the comments made by Mr. Lee about Ron Hunt. I was a bartender for the Ritz, bartenders are the management, we are responsible for running the club. Before I became a bartender I was a dancer there for two years.
> When I first encountered Ron Hunt, I was working and he tipped me fifty dollars. I did no know who he was at the time. He came into the club two times after that. The second time I saw Ron talking with Mr. Lee about purchasing the club. They were in meetings all day discussing the club. The next time Ron came in he did not meet with Mr. Lee, but he did bring some of his dancers with him.
> After I saw Ron and Mr. Lee discussing the sale of the club, I asked Mr. Lee if he was going to sell the club and he said no. He also said that he didn't want to sell the club to Ron because he was too arrogant and he was always throwing his money around. He kept saying that he did not want Ron changing anything and that Ron wouldn't treat "his family" right. Mr. Lee said that Ron was cocky and arrogant, and that Ron didn't trust his employees the way that Mr. Lee did. He also said that because Ron was so arrogant, he felt like Ron would "treat his girls bad" and that Ron would bring the club down. But I think that it would be good if Ron took over the club and cleaned it up.
> The Ritz is a nasty place to work. I was constantly using hand sanitizers to keep myself clean. I remember when the Health Department came and could have shut the Ritz down. You're not supposed to keep anything in with the ice, but there were always sodas, champagne, and beer in with the ice. The Health Department also cited the Ritz because they could not find a hand washing sink behind the bar because it was covered by a bunch of dirty rags. They probably would have shut the club down, but they couldn't find the biggest violation. There is a basement in the Ritz, but there is a separate entrance outside on another building. That's where the septic tank is, and it's broken. It's been

11

broken. Whenever you flush a toilet in the club, it goes into the basement. There is knee deep waste in the basement. At one point, Mr. Lee was letting it out onto the street until people started complaining. Even with the septic tank being broken, Mr. Lee still won't hire a professional to fix anything.

The club is not secure either. There is a doorway in the back of the club that doesn't have a door. Not many people know about it, but anyone can hop a few fences and then come into the club through that entrance. I've been robbed before where someone came in through that entrance as well. Junkies have come into the club through that entrance as well. Mr. Lee even had one living in the club and paid him to clean behind the bar. He was a heroine addict and had open sores on his arms and face. Even with the open sores, Mr. Lee let him stock glasses and beer.

A lot of drug dealers frequent the club and a lot of girls do drugs. There was one girl who use [sic] to leave needles around the club, laying on the floors. I also remember when I was running the day shift, I had to fire two girls for prostitution. And it was with the same guy I had previously told the bouncers to watch. The first girl had unprotected sex with the man, in the club, and the other girl gave him oral sex in the club. I fired them both when I found out what took place.

Mr. Lee stated that he wanted Dennis, who is white, to own the club. *Exhibit M*, Affidavit of Nicole Fuoco.

In yet another affidavit, Mr. Lee's defamatory statements concerning Plaintiff Hunt are further detailed:

I, Megan E. Mattson, of 9160 Bourbon Street, Apartment L, Laurel, Maryland 20723 being duly sworn state the following regarding my knowledge of the statements made by Mr. Lee, owner of the Ritz Cabaret located on South Broadway in Baltimore, Maryland, regarding Ron Hunt, owner of the Nexus Gold Club and prospective buyer of the Ritz Cabaret.

On one particular day in May, 2002, Ron Hunt came to the Ritz Cabaret to discuss the purchase of the club with the owner, Mr. Lee. I did not personally see Mr. Hunt come into the club that night because he had already left by the time that I arrived , but I was made aware of his visit by one of the bartenders who was commenting about how

12

>much money she had made on account of Mr. Hunt.  The bartender specifically mentioned to me that Mr. Hunt had come into the Ritz Cabaret to talk to Mr. Lee about buying the club.
>
>After speaking with the bartender, I went to place my name on the dance board.  At this moment, I encountered Mr. Lee who was seated near the dance board as usual.  I asked him: "Who's gonna buy the club?"  He responded: "That cocky, arrogant motherfucker will never get this club."  Mr. Lee then continued by stating that Mr. Hunt would never be able to keep the in the condition that it was in and that Mr. Hunt would not be able to keep the club up and running.  He said that Mr. Hunt could not keep the club open for a month.  He said that the Ritz was an upscale place and that Mr. Hunt was going to bring the club down.  He also said that Mr. Hunt would bring a lower class of clientele.  I knew that Mr. Lee was referring to Ron Hunt because Mr. Hunt was the only person who had come in to discuss the purchase of the club that particular day.  Although I never personally saw any other buyers come into the club, I knew from other employees at the Ritz Cabaret that there were other persons who had come into the club looking to buy it.   I have never heard Mr. Lee make comments about any other buyer, besides Mr. Hunt, that has come into the club looking to purchase it. *Exhibit N*, Affidavit of Megan Mattson.

The Defendant in this matter contends that Defendant Lee's statements concerning Ron Hunt are not actionable.  In purporting to support these contentions, the Defendant cited several cases in his Motion to Dismiss Amended Complaint from various jurisdictions which are not binding on the Fourth Circuit.  Specifically, the Defendant stated that: "Accusations that plaintiff was 'arrogant' or 'cocky' merely state an opinion and do not contain a provably false factual connotation."  Page 7.  In contradiction to this contention, Maryland case law reveals that "a statement, even if expressed in terms of an opinion, can be defamatory under certain circumstances regardless of whether the statement concerns a public figure or private person.  When the underlying facts used to form the opinion are not given along with the defamatory statement, the statement itself

may be treated as being factual and therefore potentially defamatory." *Peroutka v. Streng*, 116 Md. App. 301, 319-20, 695 A.2d 1287, 1297 (1997), *citing generally A.S. Asbell Co. v. Kirby*, 227 Md. 267, 282 (1961). As "the underlying facts used to form the opinion are not given along with the defamatory statement, the statement [against Plaintiff Hunt] may be treated as being factual and therefore potentially defamatory." *Id.*

As a matter of professional responsibility, Defendant Lee's attorney is required to address case history which negatively impacts on the Defendant's case. However, Defense Counsel completely failed to address Maryland common law. This failure to cite negative case history is irresponsible at best and perpetrating a fraud against this Court at worst. Defamation is a common law tort. Maryland case law defines a defamatory statement as "one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person." *Chesapeake Publishing Corp. v. Williams*, 339 Md. 285, 295, 661 A. 2d 1169, 1174 (1995), *citing Batson v. Shiflett*, 325 Md. 684, 722-23, 602 A.2d 1191 (1992). The statements of Defendant Lee about Plaintiff Hunt, published to third parties, are in direct contradiction to Plaintiff Hunt's established reputation as a successful businessman and owner of the popular Nexus Gold Club, the largest gentleman's club on the east coast. These statements are therefore considered defamatory under Maryland common law as others in the community are discouraged "from having a good opinion of, or from associating or dealing with, [Plaintiff Hunt]." *Id.*

Furthermore, the affidavits of Ms. Fuoco and Ms. Mattson also negate Defense Counsel's contention that the Defendant lacked capacity to enter into a binding contract

14

to sell the Ritz Cabaret.  Ms. Fuoco personally observed Plaintiff Hunt discussing the purchase of the Ritz Cabaret with the Defendant.  Ms. Mattson was also aware of Plaintiff Hunt coming into the Ritz Cabaret to discuss the purchase of the club.  This lends further credence to Plaintiff Hunt's statements, and also the statements of Defendant's agent/realtor, Mr. Eichelberger, that Defendant Lee had been given special permission by the United States government to sell the Ritz Cabaret to pay his debts.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff Ron Hunt respectfully requests that this Court deny Defendants' Motion to Dismiss Amended Complaint.

Respectfully submitted,

_____
Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, MD 20772
(301) 599-7620
(301) 599-7623(fax)
Counsel for Plaintiff
Bar No. 14639

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **RON HUNT** | : |
| Plaintiff, | : Civil Action No: L02-CV-252 |
| | : (WDQ) |
| v. | : |
| **TRACEY'S INC. t/a** | : |
| **RITZ CABARET** | : |
| and | : |
| **FRANCIS LEE** | : |
| Defendants. | : |

## **ORDER**

Upon consideration of Defendant's Motion to Dismiss Amended Complaint and Plaintiff's Opposition thereto, and in the interests of justice, it is this _____ day of _____, 2003,

ORDERED, that Defendants' Motion to Dismiss Amended Complaint is hereby DENIED.

_____
U.S. DISTRICT COURT JUDGE

16