### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

RON HUNT                                    *

      Plaintiff                      *
                                Civil Action
   v.                                      *
                                No. 02-CV-2523

TRACEY'S INC., t/a/ RITZ CABARET,   *
 et al.
                          *

      Defendants                   *

   *    *    *    *   ********   *    *    *    *

### REPLY TO PLAINTIFF'S AMENDED OPPOSITION
### TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

Defendant, through undersigned counsel, hereby replies to Plaintiff's Amended Opposition to Defendant's Motion to Dismiss the Amended Complaint.  As defendant shows in Part III below, plaintiff can show no set of facts on which he could prevail on the federal civil rights counts, and summary judgment should be entered in favor of defendant.  Furthermore, as shown in Part IV, the statements plaintiff alleges are defamatory are all either incapable of being defamatory, or are shown to be substantially correct by the plaintiff's own pleadings.  Therefore this Court should enter judgment for defendant on the defamation count as well, or, alternatively, dismiss the state law claim under 28 U.S.C. § 1367(c)(3).

## I.  THE COMPLAINT IS DEFECTIVE IN THAT IT FAILS TO ALLEGE JURISDICTION

In the motion to dismiss the complaint, Defendant argued that the complaint was fatally defective for failure to allege a proper basis for jurisdiction.

Plaintiff argues in his opposition that he is invoking both federal question jurisdiction and diversity of citizenship. Plaintiff admits that plaintiff Ron Hunt currently resides at 1200 Golf Course Drive, Mitchellville, Maryland.  Opp. p. 2.  Plaintiff then states that diversity is established because defendant Francis Lee is incarcerated at Morgantown Federal Correctional Institution in Morgantown, West Virginia.  Opp. p. 2.

For purposes of determining diversity jurisdiction, however, a prisoner's domicile is presumed to be where he was domiciled prior to incarceration.  *Polakoff v. Henderson*, 370 F. Supp. 690 (N.D. Ga. 1973), aff'd, 488 F.2d 977 (5th Cir. 1974).  Although this presumption may be rebutted by an inmate's intention to change domicile, see *Jones v. Hadican*, 552 F.2d 249 (8th Cir.), cert. denied, 431 U.S. 941 (1977), absent such an intent the presumption is not rebutted.  Frances Lee's domicile is 5054 Spring House Circle, Baltimore, MD 21237 – the place he lived before his incarceration, and the place he intends to live when released. See Declaration of Linda Buck filed herewith.  Thus, there is no diversity.

As we show in part III below, there is no federal question jurisdiction either, because both of plaintiff's federal causes of action are fatally defective.

## II. PLAINTIFF'S SUBMISSION OF MATTERS OUTSIDE THE PLEADINGS CONVERTS DEFENDANT'S MOTION TO A MOTION FOR SUMMARY JUDGMENT

Defendant filed his Rule 12(b)(6) Motion to Dismiss the Complaint prior to filing an answer to the complaint. Although his motion included an appended court judgment (the preliminary order of forfeiture) and a request that the court take judicial notice thereof, defendant submitted Fourth Circuit authorities indicating that the court, in ruling on a Rule 12(b)(6) motion, could take judicial notice of court orders in related cases. See Defendant's Memorandum of Points and Authorities in Support of Defendant's Rule 12(b)(6) Motion to Dismiss, pp. 5-6. Under this line of authority, submission of the appended order of forfeiture did not convert defendant's 12(b)(6) motion into a motion for summary judgment.

However, plaintiff's Opposition to defendant's motion contained matters outside the pleadings, including declarations and documents. Under Federal Rule of Civil Procedure 12(b), if, on a Rule 12(b)(6) motion,

> matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

F.R.Civ.P. Rule 12.

Even if the allegations in plaintiffs' complaint, his Opposition, and supporting exhibits were true, they do not state a claim under any of the federal or state causes of action. Judicial economy would best be served by converting defendant's Rule 12(b)(6) motion to a motion for summary judgment.

### III. <u>THE FEDERAL CIVIL RIGHTS CLAIMS (COUNTS I AND II) ARE FATALLY DEFECTIVE</u>

Defendant showed in the motion to dismiss that plaintiff could prove no set of facts to sustain his claims of racial discrimination in the making and enforcement of private contracts (42 U.S.C. § 1981) nor racial discrimination in the sale of real estate (42 U.S.C. § 1982), since the subject real estate had been forfeited to the federal government prior to the events plaintiffs alleges in his complaint.

Plaintiff tries to counter these fatal defects in his cause of action by stating that he was told by Jeorg Eichelberger, allegedly as an agent of Francis Lee, that the federal government was allowing him to sell the property. The truth is Eichelberger had no such authority. However, even if something Mr. Eichelberger said led Hunt to believe that, it does not change the fact that Mr. Lee no longer owned the Ritz Cabaret and thus he had no legal capacity to enter a binding contract to sell it.

Admissions made in plaintiff's Opposition and supporting documents show Mr. Hunt was well aware of Mr. Lee's legal

4

difficulties, including the forfeiture of the Ritz Cabaret.  If Mr.
Hunt had any questions about the legal effect of the Preliminary
Order of Forfeiture, he should have directed them to his own lawyer
or the U.S. Attorney's Office or U.S. Marshal Service, rather than
relying on Mr. Lee's or the real estate agent's (Mr.
Eichelberger's) lay understanding of the law.

However, it is clear from the documents plaintiff submitted
with his Opposition that he was not mislead.  The correspondence
from Joerg Eichelberger fully disclosed the fact that the federal
government would be making the final decision on the sale of the
club.  The Eichelberger fax dated 04/05/02  states in the last
paragraph: "FYI: The seller has the authorization to sell the
business and the property, including all of the licenses, we have
to submit the offer to the feds for the final approval...."
Although the above sentence is somewhat unclear as to who "the
seller" is, the fact that the "offer" had to be submitted to the
"feds" for final approval clears up any remaining doubt that Lee
might still have the ability to enter a binding contract to sell
the property or to convey valid title.

The letter from Eichelberger dated 5/28/02, begins with
"[s]ince the federal government has seized the Ritz..." and
explains:

> The way it works is the same as I told you before, any
> legit contract is forwarded to the Federal Government,
> they will investigate the person or group to see if these
> are qualified to purchase the Ritz.  No contingencies are

5

accepted especially financing.   Its basically like an
auction, the best party qualified wins the bid.

Thus, although the letter calls this a "contract" in one place and
a "bid" in another, the overall meaning of the letter establishes
that these are all merely bids or offers, which must be accepted by
the federal government.  Eichelberger's letter dated June 7, 2002,
states "I will forward your client's offer..."  Similarly, his June
13 letter talks about "your offer" and "the offer from the other
group."

This language does not suggest that Lee had special permission
from the federal government to sell the Ritz Cabaret, as plaintiff
claims.  There was no such agreement, and thus there is nothing to
be gained in discovery that could plug the holes in plaintiff's
case.   The U.S.  Marshal Service manages and disposes of all
property forfeited to the U.S. government.[1]   The U.S. Attorney's
Office and U.S. Marshal Service had allowed Lee and his club
manager to continue operating the Ritz Cabaret between the
preliminary forfeiture order and Lee's sentencing – but there was
no formal agreement allowing this and it could be terminated at any
time, at the government's whim.  That is in fact how it ended – the

---

[1]

"The Marshals Service administers the Department of Justice's
Asset Forfeiture Program by managing and disposing of properties
seized and forfeited by federal law enforcement agencies and U.S.
attorneys nationwide."  U.S. Marshal Service website,
www.usdoj.gov/marshals/factsheets/afo02.htm.

U.S. Marshal Service only gave a few hours' notice before arriving with numerous armed agents and padlocking the club.

The "contract" between Lee and Philip Bast Gagne and Dennis Alviani – which the plaintiff attached to his opposition, and offered on page 5 as proof that defendant had the capacity to sell the property – does not cure this defect.   Though it is written in the form of a contract, legally the Gagne bid was merely an offer as well.   The U.S. Marshal Service listed the property on the on-line auction Bid4Assets, and invited anyone who was interested in purchasing it to submit bids online through Bid4Assets.   For whatever reason, Mr. Hunt chose not to bid on line.   The winning bidder was Joseph Soltas.   See Government's Motion to Amend Final Forfeiture Order, *United States v. Lee*, Crim. No. S-01-0232, Docket # 187, filed 12/18/2002, p. 1, para. 2.

As argued in the Motion to Dismiss the Amended Complaint, "claims of racial harassment and discriminatory treatment" by a private individual that are not based on the making or enforcement of a private contract do not state a claim under 42 U.S.C. § 1981. *Graham v. Jones*, 709 F.Supp. 969, 972-73 (D.Or. 1989), citing *Runyon v. McCrary*, 427 U.S. 160, 168 (1976).   The incidents of alleged racially discriminatory treatment which plaintiff alleges in his complaint all occurred in May 2002.   See Complaint para. 8-13.   By that time, the Preliminary Forfeiture Order had already been entered, forfeiting Lee's interest in the Ritz Cabaret to the

U.S. government, depriving Francis Lee of the ability to enter into a binding contract to sell the property to anyone. It was thus impossible for Mr. Lee to violate either § 1981 or § 1982 by refusing to sell it to Mr. Hunt.

**IV.  <u>COUNT III (STATE CLAIM FOR COMMON LAW DEFAMATION)</u>**

**a.  Plaintiffs' complaint, plus the allegations and supporting documents submitted in his Opposition to our Motion to Dismiss, taken in the light most favorable to him, still do not state a claim for defamation**

"[W]hether a statement is capable of a defamatory meaning is a question of law to be determined by the court." *Agora, Inc. v. Axxess, Inc.*, 90 F.Supp.2d 697, 702 (D. Md. 2000), citing *Batson* 325 Md. at 723. "In Maryland, it is for the court to say what is the import of an accused [statement]." *Sauerhoff v. Hearst Corp.*, 538 F.2d 588, 591 (4th Cir. 1976). Thus, determining whether a statement is capable of being defamatory "is amenable to determination on a motion to dismiss, provided that as in this case the complaint sets forth the allegedly defamatory term in its full context." *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996).

Plaintiff's Opposition and his supporting declarations by Nicole Fuoco[2] and Megan Mattson detail the following statements allegedly made by Lee:

> [Lee] said that he didn't want to sell the club to Ron because he was too arrogant and he was always throwing his money around. He kept saying that he did not want Ron changing anything, and that Ron wouldn't treat "his family" right. Mr. Lee said that Ron was cocky and arrogant, and that Ron didn't trust his employees the way that Mr. Lee did. He also said that because Ron was so arrogant, he felt like Ron would "treat his girls bad" and that Ron would bring the club down. But I think that it would be good if Ron took over the club and cleaned it up.

Declaration of Nicole Fuoco, bartender at the Ritz Cabaret, ¶ 3. The other declarant was Megan Mattson, a dancer at the Ritz Cabaret, who arrived later, and after hearing about the conversation between Lee and Fuoco from Ms. Fuoco, questioned Lee herself:

> I asked [Lee]: "who's gonna buy the club?" He responded: "That cocky, arrogant motherfucker will never get this club." Mr. Lee then continued by stating that Mr. Hunt would never be able to keep the in the condition that it

---

[2]   The declaration plaintiff submitted from Nicole Fuoco contain statements capable of being defamatory against defendant Frances Lee, including allegations that Lee was letting raw sewage out into the street at the club; that the septic tank was broken and drained into the basement; that he was letting heroin addicts live and work in the club; and that Lee's dancers were engaging in prostitution and using drugs in the club. Opp. 11-12. These defamatory allegations against Lee do nothing to help plaintiff's case, and should be striken from the pleading as "immaterial, impertinent and scandalous matter." F.R.Civ.P. Rule 12(f).

was in and that Mr. Hunt would not be able to keep the
club up and running.  He said that Mr. Hunt could not
keep the club open for a month.  He said that the Ritz
was an upscale place and that Mr. Hunt was going to bring
the club down.  He also said that Mr. Hunt would bring in
a lower class of clientele.

Mattson declaration ¶ 3.

Breaking these statements down into their components, all of
the allegedly defamatory statements can be summed up as follows:

(1) Hunt was "too arrogant," "cocky and arrogant," and "so
arrogant;" "that cocky, arrogant motherfucker."

(2)  Hunt "was always throwing his money around."

(3) "[B]ecause [Hunt] was so arrogant, he felt like [Hunt]
would "treat his girls bad."  Hunt would not treat Lee's "family"
right. "[Hunt] did not trust his employees the way that Mr. Lee
did."

(4)  Hunt would not be able to "keep the club in the condition
that it was in," "keep the club up and running" or "keep the club
open for a month."

(5)  Hunt "was going to bring the club down" or "would bring
in a lower class of clientele."

As we show below, none of these statements constitute
defamation against Mr. Hunt.  Even if Lee had said the words
plaintiff attributed to him,[3] as a matter of law those statements

---

[3]  Defendant denies saying the words attributed to him, but
has not had a chance to plead yet, since his motion was filed as
a Rule 12(b)(6) motion.

are either too vague and subjective, or "rhetorical hyperbole, incapable of being defamatory," or protected statements of opinion, or substantially true.

> **1.    Plaintiff failed to counter defendant's arguments showing the alleged statements were non-defamatory**

In his Opposition, plaintiff made no attempt to counter the authorities that defendant had submitted on this issue in his Motion to Dismiss, pp. 6-7. See Plaintiff's Opposition pp. 10-15. Instead plaintiff implied that it was defendant's attorney's responsibility to do the legal research plaintiff should have done before filing suit, and that the onus was on defendant to "address case history which negatively impacts on the Defendant's case." Opp. p. 14.

Defendant has now been forced to do the research plaintiff should have done before filing his frivolous lawsuit. The cases plaintiff cited – *A.S. Asbell Company v. Kirby*, 227 Md. 267, 176 A.2d 340 (1961), *Batson v. Shiflett*, 325 Md. 684, 722-23, 602 A.2d 1191 (Ct. App. Md. 1992), *Chesapeake Publishing Corp. v. Williams*, 339 Md. 285, 295, 661 A.2d 1169, 1174 (1995), *Peroutka v. Strent*, 116 Md. App. 301, 695 A.2d 1287 (1997) – do not help him.

*A.S. Asbell Company v. Kirby*, is not on point. It deals with the "fair comment" defense, which exempts newspapers from libel for publishing criticism of books, plays, etc. in newspapers, when the requirements of that defense are met.

11

*Chesapeake Publishing Corp. v. Williams*, involved a newspaper's allegations of child abuse, assault and battery, drunkenness and temper fits against a public figure. The court found some of the statements were not defamatory, some were true, and that plaintiff had not proven actual malice.

In *Batson v. Shiflett*, the court held that a defendant's public accusations that the plaintiff committed "'crimes' that he misused and embezzled union funds... cannot be considered 'mere rhetorical hyperbole' deserving of constitutional protection." 325 Md. at 725. Here, however, there is no allegation that Mr. Lee accused Mr. Hunt of committing any crimes.

*Peroutka v. Streng*, was a slander case, in which the defendant stated the opinion that Mrs. Peroutka was an "emotionally abused spouse." After discussing a series of U.S. Supreme Court cases "which made it more difficult for individuals to recover for defamation under state law," the court held that the statement was not defamatory as to Mrs. Peroutka, 116 Md.App. at 312. To the extent the statement implied that Mr. Peroutka was the abuser, the court was doubtful

> that alleging one is an emotional abuser is the type of statement that would "expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person."

116 Md.App. at 313 n. 7. As we show below in part IV-A-4, *Peroutka* actually supports defendant's position – not plaintiff's.

12

The definition of a defamatory statement which plaintiff quotes from *Chesapeake Publishing* – a statement "which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing, with that person" – is black letter law, but it is far too general to be of much help in this case.

Plaintiff ignored legal principles, even in the cases he cited, that are directly on point with the issues here, and which show plaintiff's complaint fails to state a claim upon which relief may be granted.

### 2.    To be capable of defamatory meaning, a statement must assert a provably false fact

> Though a statement of opinion is not immune from suit, a statement is not actionable unless it asserts *a provably false fact or factual connotation.* In divining the line between statements of fact and opinion, *Milkovich* [*v. Lorain Journal Co.*, 497 U.S. 1 (1990)] places primary emphasis on the verifiability of the statement and examines the statement's language to determine if it may be interpreted as asserting a fact.

*Agora Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697, 702 (D.Md. 2000) (internal citations omitted, emphasis added). "The use of generalized subjective valuations, rhetorical hyperbole and imaginative expression 'negates the impression that the [speaker] is stating fact." Id. at 703.

### a. Generalized, subjective valuations cannot be defamatory

The "use of unquantifiable and indeterminate terms such as 'real' and 'pseudo' and ... 'puffery' cannot 'reasonably [be] interpreted as stating actual facts." *Agora Inc. v. Axxess, Inc.*, 75 F.3d at 703. "Cocky" and "arrogant" are similarly vague and unquantifiable terms.

### b. Rhetorical hyperbole and imaginative expression is not defamatory

Among the terms or epithets that have been held (all in
the cases we've cited) to be incapable of defaming
because they are mere hyperbole rather than falsifiable
assertions of discreditable fact are "scab," "traitor,"
"amoral," "scam," "fake," "phony," "a snake-oil job,"
"he's dealing with half a deck," and "lazy, stupid, crap-
shooting, chicken-stealing idiot." It is apparent from
the list that the defamatory capability of these terms
cannot be determined without consideration of context.
See *Greenbelt Coop. Publishing Ass'n, Inc. v. Bresler*,
398 U.S. 6, 14 (1970) ("blackmail"); *McCabe v. Rattiner*,
814 F.2d 839 (1st Cir. 1987) ("scam"). Each of the terms
has both a literal and a figurative meaning and whether
it is capable of being defamatory depends on which
meaning is intended, a question that can be answered only
by considering the context in which the term appears.
"Scab," for example, means literally one who is hired to
replace a striking worker, but it is also used
figuratively, to denote a worker who is not a union
supporter. If as in *National Association of Letter
Carriers v. Austin,* [418 U.S. 264 (1974)]*, a person is
called a "scab" in a union newsletter because he refuses
to join a union, this is not defamation but merely an
expression of hostility; the word is obviously being used
in its figurative sense. But if a union leader were
accused of having been a scab in his youth, this could
well be understood to be a literal use of the word and
therefore an assertion that he had engaged in conduct
that demonstrated his unfitness to be a union leader. And
so with "traitor," another word held nondefamatory in
*National Association of Letter Carriers v. Austin.* The

14

> use of the word in the context of that case was plainly
> figurative rather than literal, but the word was being
> used in its literal sense when Whittaker Chambers called
> Alger Hiss a traitor.  Another example would be calling
> a person a "lunatic."

*Dilworth v. Dudley*, 75 F.3d 307, 310 (7th Cir. 1996).

"Not only is this commentary figurative and hyperbolic, but we also can imagine no objective evidence to disprove it." *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 (1st Cir. 1992).

Applying the above principles to this case, how could one prove or disprove that Mr. Hunt is "a cocky arrogant motherfucker"? It is impossible.  "Cocky," "arrogant" and "motherfucker" are all vague and indeterminate terms.  In *Peroutka*, the court found it "very difficult to ascertain what type or degree of conduct constitutes emotional abuse."  Here it is very difficult to ascertain what type or degree of conduct makes one  "a cocky arrogant motherfucker."

"Motherfucker" is a slang expression, and though a literal meaning can be imagined from the juxtaposition of the two root words, in common parlance the word is never used literally. Instead it is a "vigorous epithet" used to express one's extreme dislike for a person.  This is what the Supreme Court has called "the rhetorical hyperbole and imaginative expression which has added much to the discourse of our Nation." *Milkovich*, 497 U.S. at 16-17.

    **c.  Admissions    made    in    plaintiff's    motion    and supporting    declarations    show    several    of    the allegedly slanderous statements to be substantially correct**

"A false statement is one that is not substantially correct.... The burden of proving falsity is on the plaintiff." *Batson*, 325 Md. at 726.

The only statement plaintiff alleges Mr. Lee made which could arguably be considered an actual statement of fact capable of being proven true or false was Lee's alleged statement that Mr. Hunt "was always throwing his money around."  Any doubt as to what that statement meant was dispelled by the statement in the declaration of Ms. Fuoco, former bartender at the Ritz Cabaret, that the first time she encountered Mr. Hunt in that club, he tipped her $50.  Clearly both Ms. Fuoco and Ms. Mattson, a dancer and the second declarant plaintiff used to support his Opposition, were very impressed with the big tip Hunt gave Ms. Fuoco.  Ms. Mattson stated that she "was made aware of [Hunt's] visit [to the Ritz Cabaret] by one of the bartenders who was commenting about how much money she had made on account of Mr. Hunt."  Opp. 12-13.  The occasion Ms. Mattson spoke of was the second encounter Ms. Fuoco had with Mr. Hunt, and she got her big tip on his first visit, according to her declaration.  The fact that she would remember the tip and still be talking about it the next time he came into the club showed it was a big deal to both Fuoco and Mattson.  These

16

statements tend to prove there was some truth to Lee's statement that Hunt "was always throwing his money around."

This conspicuous display of excessive generosity could also reasonably be interpreted by some as "cockiness" or "arrogance."

The Random House dictionary defines "cocky" as "arrogantly self-assertive; conceited." It defines "arrogance" as "1. a feeling of superiority or an offensive exhibition of it. 2. presumptuous or overbearing conduct, statements, etc., resulting from such a feeling."

As little as we know about Mr. Hunt, the allegations in his own pleadings tend to suggest that Hunt displayed behavior that could reasonably be considered "arrogant" or "cocky." In his Amended Complaint, he describes himself as: "owner of the Nexus Gold Club, the largest gentlemen's club on the east coast located in Washington, D.C. five blocks from the nations capital." Am. Comp. ¶ 4. He then states in paragraph 5:

> The Nexus Gold Club has been recognized by the Howard Stern Show and rated the #1 gentlemen's club in Washington, D.C. by: the E Channel's Wild on DC; Clear Channel Communications; Radio 106.7 Sports Junkies; and WFS Radio.

In his Opposition to Defendant's Motion to Dismiss, he states, on page 1 that he is "the owner of the Nexus Gold Club, the largest gentleman's club on the east coast." In case anyone might have missed it, he reiterates on page 14 of his Opposition that he is "a

successful businessman and owner of the popular Nexus Gold Club, the largest gentleman's club on the east coast."

Even if the credential he is boasting about were a listing in Who's Who in America, at some point the continual reference to it would make people think he is cocky and arrogant.  However, this boasting seems even more presumptuous when one learns that a "gentleman's club" is a euphemism for a "strip club" – a bar where women strip for the patrons' entertainment.

Ms. Fuoco's declaration states that the third time she met Hunt, he brought some of his dancers into the Ritz Cabaret with him.  ¶ 2.  That act alone could be termed "arrogant" – showing both "a feeling of superiority [and] an offensive exhibition of it."

### 4. The other statements are nondefamatory "pure" opinions

The remainder of the statements alleged to be defamatory (items 3-5) were mere opinions – Lee's predictions about the future of the club if Hunt were to own it.  Since they predicted the future, there is no way these statements could show a provably false fact.

Very significantly for purposes of this slander case, the alleged statements were not made to the general public, but only to two of Lee's employees.  Lee considered his employees his "family" and was very concerned about his employees' fate when the club changed hands – something which would happen very soon, as he was

headed to prison and the federal government would soon sell the
club to someone else.  Lee was expressing his worries to these two
employees in the form of an opinion, and stating his reasons for
that opinion.

According to Ms. Fuoco,

[Lee] said that he didn't want to sell the club to Ron
because he was too arrogant and he was always throwing
his money around.  He kept saying that he did not want
Ron changing anything, and that Ron wouldn't treat "his
family" right.  Mr. Lee said that Ron was cocky and
arrogant, and that Ron didn't trust his employees the way
that Mr. Lee did.  He also said that because Ron was so
arrogant, he felt like Ron would "treat his girls bad"
and that Ron would bring the club down.

Declaration of Nicole Fuoco para. 3.  No one could reasonably
believe Lee was stating a fact when he said Hunt "would treat his
girls bad" or "would bring the club down" because those things had
not happened; Lee was predicting the future.  In *Peroutka*, 116
Md.App. at 314, the court held that, to distinguish between fact
and opinion, ask "would an ordinary person, reading the matter
complained of, be likely to understand it as an expression of the
writer's opinion or as a declaration of an *existing* fact?"
(Emphasis added).  Because these statements were predictions of the
future, they could not be interpreted as stating existing fact.

A statement in the form of an opinion "is actionable only if
it implies the allegation of undisclosed defamatory facts as the
basis for the opinion."  Restatement (2d) of Torts § 566, quoted in
*Peroutka*, 116 Md. App. at 318.  "If the facts from which a

19

defendant forms his or her opinion are given or are readily available and those facts cannot be proved false, the defendant is not subject to liability for the opinion." Id. at 320 (citing Maryland law). "If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of facts that are not defamatory, he is not subject to liability for the factual statement – nor the expression of opinion, so long as it does not reasonably indicate an assertion of the existence of other, defamatory, facts that would justify the forming of the opinion." Id. at 323. Finally, *Peroutka* held that when the alleged defamatory statement was published only to a few persons, all with firsthand knowledge of the facts that led the speaker to form the opinion, in that context, it is obvious that the speaker was expressing an opinion, and the statement was not defamatory.

The same is true here. The alleged defamatory statements were only made to two persons, both employees of Lee's club – Ms. Fuoco, the bartender, and Ms. Mattson, a dancer. The conversations concerned the future of the business if Hunt succeeded in buying it. They had discussed Hunt's behavior as a conspicuously excessive tipper. The two women were both favorably impressed with his excessive tip to Mattson; Lee took it as a sign of cockiness and arrogance, and it aroused his distrust of Hunt as the potential future employer of Lee's "family" of employees. These were matters

of great concern to all three of them, and they all knew the background from which Lee reached his opinion.

It is also true that Lee's statement of his opinion of Hunt's prospects as owner of the club did not change Ms. Fuoco's opinion, for she stated in her declaration: "But I think that it would be good if Ron took over the club and cleaned it up." Clearly Lee's statement of his opinion to her did not injure Hunt in his business relationship with Fuoco, nor discourage her "from having a good opinion of, or from associating or dealing with" Hunt.

### B. Plaintiff's Complaint is also defective for failing to allege actual damages

Under Maryland common law, a distinction was traditionally drawn between *per se* defamation and defamation *per quod*.

Defamations *per se* – statements accusing a person of a crime, a loathsome disease, or unchastity, or which "injure the plaintiff in his office, trade or business" – were traditionally held to be actionable under Maryland law without allegation or proof of special damages. *Sauerhoff v. Hearst Corporation*, 538 F.2d 588, 591 (4th Cir. 1976). As shown below, this case does not involve *per se* defamation, since it does not meet the requirements of injury to plaintiff's "office, trade or business." Therefore, plaintiff's cause of action is for slander per quod, and plaintiff has the burden of proving actual damages.

21

Additionally, as *Sauerhoff* recognized, actual damages are now required even in per se defamations, after *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974):

> It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury.

### 1.    Injuries to "office, trade or business"

A statement that adversely affects a businessman's fitness for the proper conduct of his business may be slander *per se*, but "the words must go so far as to impute to him some incapacity or lack of due qualification," or "disqualify him or render him less fit properly to fulfill the duties incident to [his position]." *Samuels v. Tschechtelin*, 135 Md.App. 483, 550 (Ct. Sp. App. 2000). The words must be such that they "tend to expose [plaintiff] to the hazard of losing his office, or... charge him with fraud, indirect dealing or incapacity and thereby tend to injury him in his trade, profession or business." *Id*.

It is black letter law that this exception is

> limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities, where such special significance is lacking....

Prosser, Law of Torts, p. 758 (4th Ed., 1971). Prosser gives several illustrative examples. It is slander per se to accuse a physician of being a butcher; a teacher of improper conduct to his

pupils; a merchant of selling adulterated goods; or a public official of bribery.  It is not actionable without proof of special damages to accuse a gas company clerk of consorting with prostitutes, "since he might still be a satisfactory clerk," Id. at 759; or to call a physician an adulterer, a dancing teacher a drunk, or an engineer a Communist – for the same reasons: this is not the type of misconduct of significance and importance to the particular career.  Thus,

> [t]he effect of a charge that the plaintiff is insolvent, illiterate, a coward or has been seen drunk, may depend upon whether he is a merchant, a professor, a soldier, or a clergyman.

Id.

Given plaintiff's occupation as owner and manager of "gentlemen's clubs" it is difficult to imagine how the statements defendant allegedly made about him could hurt his professional reputation or business.

### 2.    Defamation *per quod*

> In the case of words or conduct actionable *per se*, their injurious character is a self-evident fact of common knowledge of which the court takes judicial notice and need not be pleaded or proved.  In the case of words or conduct actionable only *per quod*, the injurious effect must be established by allegations and proof of special damages and in such cases it is not only necessary to plead and show that the words or actions were defamatory, but it must also appear that such words or conduct caused actual damage.

*Samuels v. Tschechtelin*, 135 Md. App. 483, 549 (Ct. Sp. App. 2000).

Since Plaintiff's complaint cannot state a claim for slander per se, it is defective because it failed to allege any actual damages.

> **C.  In the alternative, plaintiff's pendent state claims must be dismissed if the federal causes of action fail**

In part IV of his Opposition, plaintiff admits that his third cause of action arises under Maryland common law.  Plaintiff fails to address our argument, which we present in the alternative, that this pendent state claim should be dismissed if the court dismisses the complaint for failure to state a federal cause of action under 42 U.S.C. §§ 1981 or 1982 – the two federal counts alleged.

Plaintiff having conceded this argument, this Court therefore should dismiss count III as well.

### Conclusion

For the foregoing reasons, the complaint fails to state a claim upon which relief could be granted.  Since the defendant did not own the Ritz Cabaret at the relevant time, no set of additional facts could cure the defects in this complaint.  The same is true of plaintiff's defamation counts.  Therefore the complaint should be dismissed with prejudice.  Since the plaintiff has introduced evidence outside the pleadings, the court should grant summary judgment for defendant, including an award of costs and attorney's fees.

24

Respectfully submitted

_____
BRENDA GRANTLAND
265 Miller Avenue
Mill Valley, CA  94941
(415) 380-9108

_____
DAVID F. ALBRIGHT, JR.
Bar #02234
Local counsel
Bennett & Albright, P.A.
200 E. Lexington St., Suite 200
Baltimore, MD 21202
(410) 727-2168

Attorneys for Defendant
 Francis Lee

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Reply to Opposition Motion to Dismiss was served by Priority Mail upon Jimmy A. Bell, Law Office of Jimmy A. Bell, P.C., 9610 Marlboro Pike, Upper Marlboro, MD 20772, this _____ day of _____, 2003.

_____
BRENDA GRANTLAND

25