## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

|  |  |
|---|---|
| **RON HUNT** : |  |
| : | Civil Action No: L02-CV-252 |
| Plaintiff, : | (WDQ) |
| : |  |
| v. : |  |
| : |  |
| **TRACEY'S INC. t/a** : |  |
| **RITZ CABARET** : |  |
| : |  |
| and : |  |
| : |  |
| **FRANCIS LEE** : |  |
| : |  |
| Defendants. : |  |

_____:

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
### PLAINTIFF'S OPPOSITION TO DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff Ron Hunt, by and through counsel Jimmy A. Bell, Esq. and the Law Office of Jimmy A. Bell, P.C., and respectfully submits this Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

For cause, Plaintiff states the following:

### STATEMENT OF GENUINE ISSUES OF
### MATERIAL FACTS IN DISPUTE

Plaintiff's claims should withstand Defendants' Motion for Summary Judgment because the following issues of material facts exist to be tried:

1.      Whether Defendant Lee and/or Jeorg Eichelberger were acting as agents of the U.S. Marshal Service when they were soliciting and

attempting to negotiate sale of the Ritz Cabaret and property

located at 504 S. Broadway, Baltimore, MD.

2.       Whether the U.S. Marshal Service notified Plaintiff Hunt or his

attorney about the online bidding process to be used in the sale of

the Ritz Cabaret.

3.       Whether other African Americans were excluded from the online

bidding process used to sell the Ritz Cabaret.

### BACKGROUND FACTS

Plaintiff Ron Hunt is an African-American citizen of the United States and the

owner of the Nexus Gold Club, the largest gentleman's club on the east coast.  From

February of 2002 to May of 2002, Plaintiff Ron Hunt met with Defendant Francis Lee

and his agent, Joerg Eichelberger, numerous times in order to discuss the purchase of the

Ritz Cabaret by the Plaintiff.  Plaintiff Hunt also submitted written offers to the

Defendant for the purchase of the Ritz Cabaret.  Mr. Eichelberger specifically told

Plaintiff Hunt that no contingencies, including financing, would be accepted and that

Plaintiff would have to pay $1.6 million to purchase the Ritz Cabaret in addition to a six

percent (6%) buyer's fee.  However, on May 22, 2002, Defendant Lee entered into a

Contract of Sale with a non-African American purchaser, which indeed contained

contingencies and which did not include any provision for paying an additional six

percent (6%) buyer's fee.

Defendant Lee not only discriminated against Plaintiff Hunt contractually, but

also defamed Plaintiff Hunt to the employees of the Ritz Cabaret following Plaintiff

Hunt's visits to the Defendant's establishment between February and May of 2002.

2

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The Defendant, as the moving party, "bears the initial responsibility of informing the district court of the basis for its motion" and "demonstrating the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Upon such a showing, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e).* "[I]n deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor." *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 769 (4th Cir. 2003); *Taylor v. McDuffie*, 155 F.3d 479, 482 (4th Cir. 1998).

## ARGUMENT

I.    **DEFENDANT LEE'S REFUSAL TO ENTER INTO A CONTRACT FOR SALE OF THE RITZ CABARET WITH PLAINTIFF HUNT DUE TO PLAINTIFF'S RACE VIOLATED 42 U.S.C. § 1981 AND THEREFORE, SUMMARY JUDGMENT IS NOT APPROPRIATE.**

Section 1981 guarantees to all persons in the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). A § 1981 action, then, must be founded on purposeful, racially discriminatory actions that affect at least one of the contractual aspects listed in § 1981(b). *See General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, (1982) (Section 1981 "can be violated only by purposeful discrimination"). *Spriggs v. Diamond Auto Glass*, 165 F.3d

1015, 1018 (4th Cir. 1999).  That statute insures that all citizens will have the same right "as is enjoyed by white citizens" to purchase and hold "real and personal property." Wright v. Salisbury Club, Ltd., 632 F.2d 309, 314 (4th Cir. 1980) (quoting, *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968).  In order to establish a violation of section 1981, Plaintiff Hunt must show: (1) that he is a member of a protected group; (2) that he was a qualified buyer of defendant's property; (3) that despite his qualifications, he was rejected; and (4) that the defendant continued to seek buyers outside of his protected group after Plaintiff's rejection. *Olson v. Largo-Springhill Lmtd. Partnership*, 919 F. Supp. 847, 850 (1995).

Plaintiff Hunt meets the first prong as he is an African-American.  Plaintiff Hunt's correspondence with Joerg Eichelberger demonstrates that he has also established prong two, three, and four.  Plaintiff Hunt was qualified to purchase Defendant Lee's property and despite his qualifications and willingness to meet the terms that Mr. Eichelberger set forth, Defendant Lee entered into a contract with a buyer outside of Plaintiff's protected class.  *See generally*, *Exhibits A*, Letter from Jimmy A. Bell, Esq. to Joerg Eichelberger dated April 4, 2002; *Exhibit B*, Letter from Joerg Eichelberger to Jimmy A. Bell, Esq. dated April 5, 2002, *Exhibit C*, Letter from Jimmy A. Bell, Esq. to Joerg Eichelberger dated May 22, 2002; *Exhibit D*, Letter from Joerg Eichelberger to Jimmy A. Bell, Esq dated May 28, 2002; *Exhibit E*, Letter from Jimmy A. Bell, Esq. dated June 7, 2002; *Exhibit F*, Letter from Joerg Eichelberger dated June 8, 2002; *Exhibit G*, Letter from Jimmy A. Bell, Esq. to Joerg Eichelberger dated June 13, 2002; *Exhibit H*, Letter from Joerg Eichelberger to Jimmy A. Bell, Esq. dated June 15, 2002; *See also Exhibit J*,

Affidavit of Ron Hunt ("Furthermore, I have met with Joseph Soltas, the man who

purchased the Ritz Cabaret, and he is Caucasian.").

While the Defendant claims that "defendant did not own the Ritz Cabaret in May

2002.  The club, its underlying real estate (504 S. Broadway, Baltimore, MD), and the

liquor and adult entertainment licenses were forfeited to the United States government on

April 10, 2002." *Defendants' Memorandum of Points and Authorities in Support of*

*Defendants' Motion for Summary Judgment* at 1-2.  Plaintiff Hunt stated, in his affidavit,

that:

> I, Ron Hunt, of 1200 Golf Course Drive, Mitchellville, Maryland 20721, being duly sworn state the following regarding my experiences with Francis Lee.  I initiated communications with Mr. Lee and Joerg Eichelberger, Mr. Lee's agent, concerning the purchase of the Ritz Cabaret and all of it's [sic] licenses in February of 2002.  I had a closed door face to face meeting with Mr. Lee in February 2002.  I also met with Mr. Lee and Mr. Eichelberger together approximately three times Between [sic] February 2002 and May 2002.  On those occasions I met with Mr. Lee and Mr. Eichelberger at the Ritz Cabaret in Baltimore, and on one occasion I met with Mr. Lee and Mr. Eichelberger at my place of business, the Nexus Gold Club in Washington, D.C.  During each meeting we discussed the price, and terms of sale, for the Ritz Cabaret and all of its licenses.    Additionally, I submitted my offers in writing to Mr. Lee's agent.
>
> In response to my inquiries concerning the purchase of the Ritz Cabaret and all of it's [sic] licenses, Mr. Lee revealed to me that he had federal criminal legal problems.  Mr. Lee stated that the federal government was allowing him to sell the Ritz Cabaret in order to settle his debts.  Mr. Stated that if he did not sell it himself, the government would sell it and he would loose [sic] money.  Mr. Lee did not disclose the name of who the federal government official who was authorizing him to sell the Ritz Cabaret and all of its licenses.  At no time did Mr. Lee or his agent indicate that Mr. Lee was not in a position to enter into a contract for the sale of the Ritz Cabaret.  In fact, on May 22, 2002, Mr. Lee entered into a signed Contract of Sale with Philip Bast Gagne and Dennis Alviani, which purported to transfer ownership of the Ritz Cabaret to those named individuals.  This contract was even filed with the Baltimore City Liquor Board, for the purpose of commencing the license transfer process.  *Exhibit I*, Affidavit of Ron Hunt.

Defendant Lee specifically stated that "the federal government was allowing him to sell the Ritz Cabaret in order to settle his debts…At no time did Mr. Lee or his agent indicate that Mr. Lee was not in a position to enter into a contract for the sale of the Ritz Cabaret." *Id.*  Defendant Lee recalled speaking with Plaintiff Hunt regarding the sale of the Ritz Cabaret, stating that, "He say he going to buy the club, then we joking around when we drinking." *Exhibit L*, Deposition of Francis Lee at pg. 8, lines 13-14.

Furthermore, as correspondence between Mr. Eichelberger and Plaintiff Hunt's attorney makes clear, Plaintiff Hunt was led to believe that Defendant Lee and Mr. Eichelberger had authority to accept offers for the purchase of the Ritz Cabaret. Defendant Lee, in his deposition, explained that, "George Eichenberger, he's a real estate agent." *Id.* at pg. 7, lines 21-22.  When asked if Mr. Eichelberger was Defendant Lee's agent, Defendant Lee responded, "He just want to sell whenever I own it, but it doesn't mean that he's my agent.  He just want to sell."  *Id*. at pg. 12, lines 12-14.

In a letter dated April 5, 2002, Mr. Eichelberger specifically stated:

> Thank you for the offer you made for the Ritz Cabaret yesterday via Fax.  The offer was declined by the seller.  Like I told you the only reason we [sic] still talking with the prospective buyer's [sic] is, because of the offer that was accepted has a contingency of financing.  The seller will entertain other cash offers, of the prospective buyer is willing and able to close the deal within a reasonable time.  There is a 6% (Six per cent) buyers fee (Commission) added to the purchasing price.  If you and your buyer is [sic] still interested in negotiating, I would suggest a meeting with you, the buyer and myself.
>
> FYI: The seller has the authorization to sell the business and the property, including all of the Licenses, we have to submit the offer to the Fed's for the final approval, who in turn will release the liens that they have at this time.  *Exhibit B*, Letter from Joerg Eichelberger to Jimmy A. Bell, Esq. dated April 5, 2002.

Although Leonard Briskman specifically stated that: "After Francis Lee's sentencing and proportionality hearing on August 28, 2002, the U.S. Marshal Service began marketing the property for sale," *Declaration of Leonard Briskman* at 2, the terms of Mr. Eichelberger's April 5, 2002 letter mirror the terms set forth by Mr. Briskman in his declaration. Specifically, as stated in Mr. Eichelberger's April 5, 2002 letter, Mr. Briskman's declaration states: "We notified all potential buyers who had submitted written offers on the Ritz Cabaret that they would have to bid on the property online. They were also notified that no offers with contingencies would be accepted and that the government reserved the right to refuse to sell to any person or entity found to have a criminal record or ties to corrupt organizations. The highest bidder would undergo a criminal background check by the FBI, and if he failed to qualify, the process would be repeated with the next highest bidder." *Id.* If, as Mr. Briskman claims, the government did not start soliciting offers until August 28, 2002, how then would Mr. Eichelberger have be able to communicate these very terms to Plaintiff Hunt's attorney in April of 2004? *See Exhibit B*, Letter from Jeorg Eichelberger to Jimmy A. Bell, Esq. dated April 5, 2004. Mr. Eichelberger specifically stated, "Like I told you the only reason we [sic] still talking with the prospective buyer's [sic] is, because of the offer that was accepted has a contingency of financing. The seller will entertain other cash offers, of the prospective buyer is willing and able to close the deal within a reasonable time." *Id.*

In a subsequent letter dated May 28, 2002, Mr. Eichelberger stated:

> Since the Federal Government has seized the Ritz and all of the records there is nothing that we can provide you with, that would help your client to obtain financing from a bank. The way it works is the same as I told you before, any legit contract is forwarded to the Federal Government, they will investigate the person or group to see if there [sic] are qualified to purchase the

> Ritz.  No contingencies are accepted especially financing.  Its
> basically like a auction, the best party qualified wins the bid.
> Plus there is a 6% buyer premium added to the purchase price
> payable to: Joerg Eichelberger/Realtor, Att: Melvin Kodenski,
> Esq., 19 East Fayette Street, Baltimore, MD. 21202…Since Mr.
> Lee is temporarily under medical care (2 weeks) and the federal
> Government is not interested in running the Club, Lee's business
> partner is managing the Club with our help and 2 Managers.
> *Exhibit D*, Letter from Joerg Eichelberger to Jimmy A. Bell, Esq.
> dated May 28, 2002.

Again, Mr. Eichelberger's language mirrors the terms of sale as stated in Mr. Briskmans'

declaration.  Specifically, Mr. Eichelberger stated, "The way it works is the same as I told

you before, any legit contract is forwarded to the Federal Government, they will

investigate the person or group to see if there [sic] are qualified to purchase the Ritz.  No

contingencies are accepted especially financing.  Its basically like a auction, the best

party qualified wins the bid." *Id*.   Mr. Briskman's own statements tends to show that

Defendant Lee and Mr. Eichelberger were working with the and under the authority of

the government to sell the Ritz Cabaret.  Mr. Briskman specifically stated that, "Mr. Lee

did solicit written offers to purchase the Ritz Cabaret, which he passed on to me."

*Declaration of Leonard Briskman* at 2.

Mr. Eichelberger's letters demonstrate that Defendant Lee represented the Ritz

Cabaret as available for sale, represented himself as the owner/seller of the Ritz Cabaret

and stated the terms under which Defendant would sell the "business and that property,

including all of the Licenses." *Id*.   Mr. Eichelberger also sent Plaintiff Hunt's attorney a

letter stating that Defendant Lee had given Linda Lee Buck power of attorney "to handle

any of Francis Lee's business matters." *Exhibit H*, Letter from Joerg Eichelberger to

Jimmy A. Bell, Esq. dated June 15, 2002.  Mr. Eichelberger June 15, 2002 letter

specifically stated:

> I took your offer to Linda Lee Buck, who at this time is appointed, and has the Power of Attorney to handle any of Francis Lee [sic] business matters.
>
> You can reach Linda Lee Buck by phone at the Ritz (410) 327-0853 or at her cell phone (410) 230-5026 or by Fax at (410)-238-7554.  The offer from the other Group that is in at this time and who attempted to transfer the Liquor License without the seller's signature is in limbo at this time, we withdrew the application of the transfer, and waiting for the next step.  Hopefully the attorney is able to void the signed contract.  Since I'm going to be away to recuperate from my operation on my Spine, I won't be able to assist you, just work with Linda Lee Buck and the Attorney she will use in this matter.  If the deal goes thru the buyers premium needs to be sent to Melvin Kodenski, 19 East Fayette Street, Baltimore, Md. 21202, he represents me on all my pending, [sic] settlements's [sic].  *Exhibit L*, Letter from Joerg Eichelberger to Jimmy A. Bell, Esq. dated June 15, 2002.

Defendant Lee confirmed Mr. Eichelberger's representations in his deposition testimony, stating as follows:

> Q.    Who is Linda Lee Buck?
> A.    That's my friend.  My girlfriend.
> Q.    Did you ever give Linda Lee Buck Power of Attorney?
> A.    Yes.  *Exhibit L*, Deposition of Francis Lee at pg. 22, line 24; pg. 23, lines 1-5.

When asked specifically about Mr. Eichelberger's letter, dated June 15, 2002, and the representations contained therein, Defendant Lee responded by stating, "I didn't see the document, but Miss Linda Lee Buck mentione about that all to me at that time." *Id*. at pg. 28, lines 7-9.

Furthermore, Leonard Briskman, Deputy Chief for Business Management of the U.S. Marshal's Service, specifically stated that, "Mr. Lee did solicit written offers to purchase the Ritz Cabaret, which he passed on to me." *Declaration of Leonard Briskman* at 2.  Mr. Briskman also stated that, "We notified all of the potential buyers who had submitted written offers on the Ritz Cabaret that they would have to bid on the property online." *Id*.

Neither Plaintiff Hunt, nor his attorney was notified, by Defendant Lee or the U.S. Marshal Service, about the online bidding process used in the sale of the Ritz Cabaret. *Exhibit J*, Affidavit of Ron Hunt.   Instead, Plaintiff Hunt responded directly to the Defendant's letters and stated terms of sale of the Ritz Cabaret, providing the following response, "Please be advised that my client has authorized me to make an offer of $1.6 million dollars plus a six percent (6%) buyer's premium for the Ritz Cabaret located at 504 South Broadway in Baltimore, Maryland." *Exhibit G*, Letter from Jimmy A. Bell, Esq. to Joerg Eichelberger dated June 13, 2002.  Although Plaintiff Hunt clearly stated that he was willing to meet the terms set forth by Defendant Lee's agent Joerg Eichelberger, Defendant Lee did not accept Plaintiff's offer, but instead entered into a Contract of Sale with Philip Bast Gagne and Dennis Alviani on May 22, 2002 for $300,000.00, which purports to transfer ownership of the Ritz Cabaret from Defendant Lee to Gagne and Alviani.  This Contract specifically stated that: "Seller agrees to sell to Buyer and Buyer agrees to buy from Seller a parcel of improved real estate located in Baltimore City, Maryland and known as 504 S Baltimore Street, Baltimore, Maryland 21231 ("the Property") upon the terms and conditions set forth in this Agreement." *Exhibit K*, Contract of Sale.  Defendant Lee testified, during his deposition, that he entered into a contract for sale of the Ritz Cabaret, specifically stating:

> A.    Then I locked up, so I don't know, Then they come back and change it to $1.6 million.  That was the last time. The contract, at that time, is to take the contract for—to fighting forfeiture, the $1.6 million…
> Q.    Do you know the name of that—was that with Phillip—
> A.    Yes.
> Q.    --Bass and Dennis Alvioni, spelled A-L-V--…
> A.    Okay.  First they make an offer, so I take that offer to give to the lawyer so he going to fight for the forfeiture, because we still fighting at that time to keep the club in my name…That what's they offer.  Was            just

talk…Then they offer $1.6 million. That's the same day I go to the court. The same day I go to court. So I even look. I say, "1.6" so we say yes, because my lawyer need that paper to go to court for the government fighting for the forfeiture, at that date.

Q.   So you signed a contract with them—

A.   At that day.

Q.   That day.

A.   The same day I go to court. In the morning.

Q.   Okay.

A.   The day or the day before. I don't remember now.

Q.   The day or the day before. Okay.

A.   Yeah.

Q.   So you actually signed a contract to sell the club.

A.   I did.

Q.   Okay.

A.   Because my lawyer need that. Need the piece of paper to prove that the club worth that much money. The government cannot take my club away from me when I tool a little, small amount of money and fine me for the big money. You know, $200,000, $190,000, but take the club worth a million dollar. That's in the government law that they cannot do that.

So my lawyer ask me, "You have to have contract, any contract right now to prove that the club worth that much money so the government cannot take it. If not, they going take it."

You know what I mean? That would be fighting the court, because I file bankruptcy three time. The club don't make no money. How can you sign that much the club? You know what I mean? But I work hard for it. That's what we're fight about the forfeiture.

Q.   So, at that time when you signed the contract, you were signing the contract so that you would be able to keep you club--

A.   To keep it…

Q.   You stated that—I'll try to do it yes or no's.

The day before you went to court, or the day that you went to court, you signed a contract to sell your club for $1.6 million; is that correct…

A.   I did sign the contract before to go to court to prove that the club worth that much money…

Q.   You signed a contract to sell Phillip Bass, with Gabne and Dennis Alvioni. You signed a contract with them to sell the club for $1.6 million; is that correct?

A.   That's correct.

Q.   What happened after you signed the contract?

A.   I go to court.

Q.   What happened then?

A.   We fighting for the forfeiture, and the lawyer took the contract and being a witness to standing in the court

> prove to the judge and the prosecutor that the club worth
> that much money.  Another lawyer stand right there,
> they say the club worth that much form the U.S.
> Marshall, I guess, I don't remember.

Q.     Do you remember what happened after that?

A.     They take the club.  Doesn't matter.  The forfeiture—
       they say because the action in the club, they take the
       club. *Exhibit L*, Deposition of Francis Lee, pg. 29, lines
       8-12, 15-16, 21-14; pg. 30, lines 3-4, 9-24; pg. 31; pg.
       32, lines 1-2, 20-24; pg. 33, lines 1, 20-22; pg. 34, lines
       3-23.

When questioned by his own attorney as to the effect the Contract of Sale for the Ritz

Cabaret carried, Defendant Lee's deposition proceeded as follows:

Q.     Were these contractrs or offers that you got from the—
       from—I can't think of the—Phillip Gabne or Mr.
       Dennis, were those binding on the government?

A.     Yes…

Q.     What effect did those contracts or offers that you got
       have on the government?

A.     The contract I took from Mr. Dennis?

Q.     Uh-Huh.

A.     I don't know.  It's a piece of paper and I sign it. *Id*. at
       pg. 42, lines 9-13, 20-24.

The fact that Defendant Lee entered into this contract further demonstrates that

Defendant Lee and his agent Mr. Eichelberger held the Ritz Cabaret out for sale and

further entered into a contract with a person outside of Plaintiff's protected class under

terms that were not offered to Plaintiff Hunt.  Plaintiff Hunt has demonstrated that he is a

member of a protected class, based on his race (African-American).  Plaintiff Hunt has

also demonstrated and Defendant Lee's own deposition shows that Defendant Lee and his

agent were actively seeking purchasers for the Ritz Cabaret and represented themselves

as persons authorized to sell the property.  Furthermore, Plaintiff Hunt's correspondence

with Mr. Eichelberger, the Contract of Sale entered into by Defendant Lee for sale of the

Ritz Cabaret, and Defendant Lee's own testimony demonstrate that Defendant Lee

entered into a contract with persons outside of Plaintiff's protected class under

contractual terms not made available to Plaintiff Hunt.

## II.    DEFENDANT LEE VIOLATED 42 U.S.C. § 1982 BY REFUSING TO SELL PLAINTIFF HUNT THE RITZ CABARET BECAUSE OF PLAINTIFF HUNT'S RACE.

Section 1982 provides that "All citizens of the United States shall have the same

right, in every State and Territory, as is enjoyed by white citizens thereof to inherit,

purchase, lease, sell, hold and convey real and personal property." 42 U.S.C. § 1982.  In

order to establish a cause of action under section 1982, Plaintiff Hunt must show: "(1)

that the owner (or responsible party) placed the property on the open market for sale or

rent; (2) that the plaintiff was willing to rent or purchase the property on the terms

specified by the owner; (3) that the plaintiff communicated this willingness to the owner

at a time when the property was available for sale or rent; (4) that the owner refused to

rent or sell the property to the plaintiff on the terms which the owner indicated would

otherwise be satisfactory; and (5) that there is no apparent reason for the refusal of the

defendant to rent the property to the plaintiff other than the plaintiff's race." *Olson v.

Largo-Springhill Lmtd. Partnership*, 919 F. Supp. 847, 850 (D. Md. 1995).

Plaintiff Hunt meets the first prong as Defendant Lee and his agent Mr.

Eichelberger represented themselves as owner and agent, respectively, with the authority

to sell the Ritz Cabaret. *See generally*, *Exhibits A*, Letter from Jimmy A. Bell, Esq. to

Joerg Eichelberger dated April 4, 2002; *Exhibit B*, Letter from Joerg Eichelberger to

Jimmy A. Bell, Esq. dated April 5, 2002, *Exhibit C*, Letter from Jimmy A. Bell, Esq. to

Joerg Eichelberger dated May 22, 2002; *Exhibit D*, Letter from Joerg Eichelberger to

Jimmy A. Bell, Esq dated May 28, 2002; *Exhibit E*, Letter from Jimmy A. Bell, Esq.

dated June 7, 2002; *Exhibit F*, Letter from Joerg Eichelberger dated June 8, 2002; *Exhibit G*, Letter from Jimmy A. Bell, Esq. to Joerg Eichelberger dated June 13, 2002; *Exhibit H*, Letter from Joerg Eichelberger to Jimmy A. Bell, Esq. dated June 15, 2002.

Plaintiff Hunt's correspondence with Joerg Eichelberger also demonstrates that he has established prong two, three, and four. *Id.* Plaintiff Hunt was willing to purchase the Ritz Cabaret according to the terms specified by Mr. Eichelberger. *Id.* Plaintiff, through his attorney, communicated this willingness to Defendant Lee's agent. *Id.* Defendant Lee refused to sell the Ritz Cabaret to Plaintiff. *Id.* Finally, Defendant Lee entered into a contract with a buyer outside of Plaintiff's protected class. *Exhibit K,* Contract of Sale*, Exhibit L,* Deposition of Francis Lee at pg. 29, lines 21-24; pg. 31 1-3.

While the Defendant claims that "defendant did not own the Ritz Cabaret in May 2002. The club, its underlying real estate (504 S. Broadway, Baltimore, MD), and the liquor and adult entertainment licenses were forfeited to the United States government on April 10, 2002." *Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment* at 1-2. Plaintiff Hunt stated, in his affidavit, that:

> I, Ron Hunt, of 1200 Golf Course Drive, Mitchellville, Maryland 20721, being duly sworn state the following regarding my experiences with Francis Lee. I initiated communications with Mr. Lee and Joerg Eichelberger, Mr. Lee's agent, concerning the purchase of the Ritz Cabaret and all of it's [sic] licenses in February of 2002. I had a closed door face to face meeting with Mr. Lee in February 2002. I also met with Mr. Lee and Mr. Eichelberger together approximately three times Between [sic] February 2002 and May 2002. On those occasions I met with Mr. Lee and Mr. Eichelberger at the Ritz Cabaret in Baltimore, and on one occasion I met with Mr. Lee and Mr. Eichelberger at my place of business, the Nexus Gold Club in Washington, D.C. During each meeting we discussed the price, and terms of sale, for the Ritz Cabaret and all of its licenses. Additionally, I submitted my offers in writing to Mr. Lee's agent.

In response to my inquiries concerning the purchase of the Ritz Cabaret and all of it's [sic] licenses, Mr. Lee revealed to me that he had federal criminal legal problems. Mr. Lee stated that the federal government was allowing him to sell the Ritz Cabaret in order to settle his debts. Mr. Stated that if he did not sell it himself, the government would sell it and he would loose [sic] money. Mr. Lee did not disclose the name of who the federal government official who was authorizing him to sell the Ritz Cabaret and all of its licenses. At no time did Mr. Lee or his agent indicate that Mr. Lee was not in a position to enter into a contract for the sale of the Ritz Cabaret. In fact, on May 22, 2002, Mr. Lee entered into a signed Contract of Sale with Philip Bast Gagne and Dennis Alviani, which purported to transfer ownership of the Ritz Cabaret to those named individuals. This contract was even filed with the Baltimore City Liquor Board, for the purpose of commencing the license transfer process. *Exhibit I*, Affidavit of Ron Hunt.

Defendant Lee specifically represented to Plaintiff Hunt that "the federal government was allowing him to sell the Ritz Cabaret in order to settle his debts…At no time did Mr. Lee or his agent indicate that Mr. Lee was not in a position to enter into a contract for the sale of the Ritz Cabaret." *Id.*

Furthermore, as correspondence between Mr. Eichelberger and Plaintiff Hunt's attorney makes clear, Plaintiff Hunt was led to believe that Defendant Lee and Mr. Eichelberger had authority to accept offers for the purchase of the Ritz Cabaret. Specifically, Mr. Eichelberger stated:

Thank you for the offer you made for the Ritz Cabaret yesterday via Fax. The offer was declined by the seller. Like I told you the only reason we [sic] still talking with the prospective buyer's [sic] is, because of the offer that was accepted has a contingency of financing. The seller will entertain other cash offers, of the prospective buyer is willing and able to close the deal within a reasonable time. There is a 6% (Six per cent) buyers fee (Commission) added to the purchasing price. If you and your buyer is [sic] still interested in negotiating, I would suggest a meeting with you, the buyer and myself.

FYI: The seller has the authorization to sell the business and the property, including all of the Licenses, we have to submit the

offer to the Fed's for the final approval, who in turn will release the liens that they have at this time. *Exhibit B*, Letter from Joerg Eichelberger to Jimmy A. Bell, Esq. dated April 5, 2002.

In another letter dated May 28, 2002, Mr. Eichelberger stated:

Since the Federal Government has seized the Ritz and all of the records there is nothing that we can provide you with, that would help your client to obtain financing from a bank. The way it works is the same as I told you before, any legit contract is forwarded to the Federal Government, they will investigate the person or group to see if there [sic] are qualified to purchase the Ritz. No contingencies are accepted especially financing. Its basically like a auction, the best party qualified wins the bid. Plus there is a 6% buyer premium added to the purchase price payable to: Joerg Eichelberger/Realtor, Att: Melvin Kodenski, Esq., 19 East Fayette Street, Baltimore, MD. 21202…Since Mr. Lee is temporarily under medical care (2 weeks) and the federal Government is not interested in running the Club, Lee's business partner is managing the Club with our help and 2 Managers. *Exhibit D*, Letter from Joerg Eichelberger to Jimmy A. Bell, Esq. dated May 28, 2002.

Mr. Eichelberger's letters demonstrate that Defendant Lee represented the Ritz Cabaret as available for sale, represented himself as the owner/seller of the Ritz Cabaret and stated the terms under which Defendant would sell the "business and that property, including all of the Licenses." *Id*. Furthermore, Leonard Briskman stated that "Mr. Lee did solicit written offers to purchase the Ritz Cabaret, which he passed onto me." *Declaration of Leonard Briskman* at 2. Mr. Briskman also stated that "We notified all of the potential buyers who had submitted written offers on the Ritz Cabaret that they would have to bid on the property online." *Id*.

However, Plaintiff Hunt was never notified, by the U.S. Marshal Service or Defendant Lee, about the online bidding process purportedly used to sell the Ritz Cabaret. *Exhibit J,* Affidavit of Ron Hunt. Rather, in response to the Defendant's letters and stated terms of sale of the Ritz Cabaret, Plaintiff Hunt's attorney provided the

following response, "Please be advised that my client has authorized me to make an offer of $1.6 million dollars plus a six percent (6%) buyer's premium for the Ritz Cabaret located at 504 South Broadway in Baltimore, Maryland." *Exhibit G*, Letter from Jimmy A. Bell, Esq. to Joerg Eichelberger dated June 13, 2002.  Although Plaintiff Hunt clearly stated that he was willing to meet the terms set forth by Defendant Lee's agent Joerg Eichelberger, Defendant Lee did not accept Plaintiff's offer, but instead entered into a Contract of Sale with Philip Bast Gagne and Dennis Alviani on May 22, 2002 for $300,000.00, which purports to transfer ownership of the Ritz Cabaret from Defendant Lee to Gagne and Alviani.  Nicole Fuoco, an employee of Defendant Lee, stated in her affidavit that, "Mr. Lee stated that he wanted Dennis, who is white, to own the club." *Exhibit M*, Affidavit of Nicole Fuoco at 2.  The contract entered into specifically stated that: "Seller agrees to sell to Buyer and Buyer agrees to buy from Seller a parcel of improved real estate located in Baltimore City, Maryland and known as 504 S Baltimore Street, Baltimore, Maryland 21231 ("the Property") upon the terms and conditions set forth in this Agreement." *Exhibit K,* Contract of Sale.  Defendant Lee testified, during his deposition, that he entered into a contract for sale of the Ritz Cabaret, specifically stating, "Okay. First they make an offer, so I take that offer to give to the lawyer so he going to fight for the forfeiture, because we still fighting at that time to keep the club in my name…" *Exhibit L*, Deposition of Francis Lee at pg. 29, lines 21-24.  In order to clarify Defendant Lee's statement, Plaintiff's attorney specifically asked, "So you actually signed a contract to sell the club." *Id.* at pg. 31, lines 1-2.  To which Defendant Lee responded, "I did." *Id.* at line 3.

The fact that Defendant Lee entered into this contract further demonstrates that Defendant Lee and his agent Mr. Eichelberger held the Ritz Cabaret out for sale and further entered into a contract with a person outside of Plaintiff's protected class under terms that were not offered to Plaintiff Hunt.  Plaintiff Hunt has demonstrated that Defendant Lee and his agent Mr. Eichelberger represented themselves as the parties responsible for sale of the Ritz Cabaret. Plaintiff has also demonstrated that he was willing to purchase the Ritz Cabaret according to the terms specified by Defendant's agent and that he communicated his willingness to Defendant Lee.  Furthermore, Plaintiff Hunt's correspondence with Mr. Eichelberger, the Contract of Sale entered into by Defendant Lee for sale of the Ritz Cabaret, and Defendant Lee's own testimony demonstrate that Defendant Lee did not enter into a contract with Plaintiff Hunt, but instead entered into a contract with persons outside of Plaintiff's protected class under contractual terms not made available to Plaintiff Hunt.

Mr. Briskman's own statements tend to show that Defendant Lee and Mr. Eichelberger were working with and under the authority of the government to sell the Ritz Cabaret.  Mr. Briskman specifically stated that, "Mr. Lee did solicit written offers to purchase the Ritz Cabaret, which he passed on to me." *Declaration of Leonard Briskman* at 2.  If we are to assume the truth of Mr. Briskman's declaration, and Mr. Lee was forwarding all written offers to Mr. Briskman, then Mr. Lee would have forwarded Plaintiff Hunt's offer, of $1.6 million, plus a six percent buyer's fee, to Mr. Briskman. Mr. Briskman's declaration clearly stated that: "We notified all potential buyers who had submitted written offers on the Ritz Cabaret that they would have to bid on the property online.  They were also notified that no offers with contingencies would be accepted and

that the government reserved the right to refuse to sell to any person or entity found to

have a criminal record or ties to corrupt organizations.  The highest bidder would

undergo a criminal background check by the FBI, and if he failed to qualify, the process

would be repeated with the next highest bidder." *Id*.  However, as Plaintiff Hunt has

made clear, neither Plaintiff Hunt nor his attorney was ever contacted by the U.S.

Marshal's Service. *Exhibit J*, Affidavit of Ron Hunt. In addition on August 1, 2002, the

Baltimore Sun wrote an article entitled "Businessman claims discrimination in lawsuit

over Fells Point nightclub," clearly delineating the factual allegations alleged in the

complaint filed against Defendant Lee:

> A Washington businessman who offered more than $1.6 million
> to buy the
> troubled Ritz Cabaret nightclub said in a lawsuit filed yesterday
> that the
> club's owner refused to sell because he wanted the Fells Point
> strip bar to
> have a white owner.

> The $10 million federal discrimination claim is the latest
> problem for
> Ritz owner Francis Lee, who was convicted this year of running
> a money
> laundering scheme from the club and hiring illegal Hungarian
> immigrants as
> dancers.

> Lee could not be reached to comment yesterday. But court
> records show
> that he has been entertaining offers for more than a year to sell
> the club
> along with its adult entertainment license, the only permit in the
> busy Fells
> Point bar scene to allow nude dancing. The proceeds are
> expected to go to
> the government under federal forfeiture proceedings.

> In his lawsuit filed yesterday, Ron Hunt, who is African-
> American,
> contended that Lee has been an unfairly selective seller.
>
> Hunt, who operates the Nexus Gold Club five blocks from the
> Capitol, said
> in the lawsuit that he offered Lee $1.6 million for the club in late
> May and
> also agreed to pay a 6 percent "buyer's fee." Hunt said he agreed
> that the
> offer would include no contingencies, such as his ability to
> secure financing
> for the purchase.
>
> Hunt alleges that Lee, a 46-year-old Vietnamese immigrant,
> never
> responded to the offer and instead defamed Hunt inside the bar.
> According to
> the lawsuit, Lee told employees that Hunt would "treat his girls
> bad" and that he would "bring the club down" and "bring in a
> lower class of clientele." *Exhibit O*, Baltimore Sun Article dated
> August 1, 2002.

Mr. Briskman's declaration specifically states that: "In May 2002, I conducted an

evaluation of the Ritz Cabaret, located at 504 S. Broadway, Baltimore, MD.  Later I was

assigned the task of managing the disposition of that property for the U.S. government.

*Declaration of Leonard Briskman* at 1.  That being the case, Mr. Briskman should have

been well aware of the lawsuit as well as Plaintiff Hunt's $1.6 million dollar offer, since

it was published in the Baltimore Sun.

      In light of this, a question remains for the jury as to whether Defendant Lee and

Mr. Eichelberger, who were admittedly soliciting offers on behalf of the U.S. Marshal

Service, forwarded Plaintiff Hunt's offers to Mr. Briskman and further, if Defendant Lee

did so, why did Mr. Briskman or the U.S. Marshal Service not contact Plaintiff Hunt in

response to his offer, which was a higher bid than what the Ritz actually sold for.

*Declaration of Leonard Briskman* at 2 ("The property sold to Joseph Soltas-the highest

bidder of Bid4Assests.com-for $1,075,000.").  Even though Plaintiff Hunt placed a

higher bid than Mr. Soltas' $1,075,000 bid, Mr. Soltas, a Caucasian, was still allowed to purchased the Ritz Cabaret. *See Exhibit J*, Affidavit of Ron Hunt ("Furthermore, I have met with Josepf Soltas, the man who purchased the Ritz Cabaret, and he is Caucasian.").

Again, Mr. Briskman's own statements tend to show that Defendant Lee and Mr. Eichelberger were working with and under the authority of the government to sell the Ritz Cabaret. Mr. Briskman specifically stated that, "Mr. Lee did solicit written offers to purchase the Ritz Cabaret, which he passed on to me." *Declaration of Leonard Briskman* at 2. If we are to assume the truth of Mr. Briskman's declaration, and Mr. Lee was forwarding all written offers to Mr. Briskman, then Mr. Lee would have forwarded Plaintiff Hunt's offer, of $1.6 million, plus a six percent buyer's fee, to Mr. Briskman. Mr. Briskman's declaration clearly stated that: "We notified all potential buyers who had submitted written offers on the Ritz Cabaret that they would have to bid on the property online. They were also notified that no offers with contingencies would be accepted and that the government reserved the right to refuse to sell to any person or entity found to have a criminal record or ties to corrupt organizations. The highest bidder would undergo a criminal background check by the FBI, and if he failed to qualify, the process would be repeated with the next highest bidder." *Id*. However, as Plaintiff Hunt has made clear, neither Plaintiff Hunt nor his attorney was ever contacted by the U.S. Marshal's Service. *Exhibit J*, Affidavit of Ron Hunt. According to Maryland law, agency is a factual question that should be submitted to a jury, *Hofherr v. Dart Industries, Inc.,* 853 F.2d 259, 262 (4th Cir. 1988)); *Nat'l Mortg. Warehouse, LLC v. Bankers First Mortg. Co.*, 190 F. Supp. 2d 774, 779 (D. Md. 2002), thus summary judgment must be denied.

**III.    DEFENDANT LEE'S PUBLICATION OF FALSE STATEMENTS TO THIRD PARTIES ABOUT PLAINTIFF HUNT WAS DEFAMATORY AND THEREFORE, SUMMARY JUDGMENT MUST BE DENIED.**

Plaintiff Hunt has established that Defendant Lee made defamatory statements to third persons, that the statements were false, that the defendant was at fault legally for the statement, and that Plaintiff Hunt has suffered harm. *Gohari v. Darvish*, 363 Md. 42, 53 (Md. , 2001) (*citing, Rosenberg v. Helinski*, 328 Md. 664, 675, 616 A.2d 866 (1992) (citations omitted), cert. denied, 125 L. Ed. 2d 727, 113 S. Ct. 3041 (1993)).  According to Maryland law, a defamatory statement "tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person." *Id*.  Specifically, Defendant Lee's stated that:

> [H]e didn't want to sell the club to Ron because he was too arrogant and he was always throwing his money around.  He kept saying that he did not want Ron changing anything and that Ron wouldn't treat "his family" right.  Mr. Lee said that Ron was cocky and arrogant, and that Ron didn't trust his employees the way that Mr. Lee did.  He also said that because Ron was so arrogant, he felt like Ron would "treat his girls bad" and that Ron would bring the club down…Mr. Lee stated that he wanted Dennis, who is white, to own the club.  *Exhibit M*, Affidavit of Nicole Fuoco.

Defendant Lee also published defamatory statements to a second Ritz employee, stating:

> "That cocky, arrogant motherfucker will never get this club." Mr. Lee then continued by stating that Mr. Hunt would never be able to keep the in the condition that it was in and that Mr. Hunt would not be able to keep the club up and running.  He said that Mr. Hunt could not keep the club open for a month.  He said that the Ritz was an upscale place and that Mr. Hunt was going to bring the club down.  He also said that Mr. Hunt would bring a lower class of clientele. I knew that Mr. Lee was referring to Ron Hunt because Mr. Hunt was the only person who had come in to discuss the purchase of the club that particular day.  Although I never personally saw any other buyers come into the club, I knew from other employees at the Ritz Cabaret that there wre other persons who had come into the club looking to buy it.  I

> have never heard Mr. Lee make comments about any other buyer, besides Mr. Hunt, that has come into the club looking to purchase it. *Exhibit N*, Affidavit of Megan Mattson.

Defendant Lee's publication of these defamatory statements about Plaintiff Hunt to third parties "tends to lower [the] plaintiff in the estimation of a substantial, respectable group, though they are a minority of the total community or plaintiff's associates.'" *Crowley v. Fox Broadcasting Co.*, 851 F. Supp. 700, 702 (D. Md. 1994) (internal quotations omitted). Plaintiff Hunt is a successful, respectable businessman and the owner of the Nexus Gold Club, which is a popular and successful gentlemen's club. Defendant Lee's statements are defamatory and are not in accord with Plaintiff Hunt's reputation as a reputable business man. Furthermore, Defendant Lee's defamatory statements tend to discourage "others in the community from having a good opinion of, or from associating or dealing with, that person." *Gohari v. Darvish*, 363 Md. 42, 53 (Md. 2001). Thus, according to Maryland common law, summary judgment must be denied as Plaintiff Hunt has established that Defendant published false and defamatory statements about Plaintiff Hunt.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Defendants' Motion for Summary Judgment as to all counts in Plaintiff's Complaint and allow Plaintiff to amend his complaint and continue suit against Defendant Lee and the United States Marshal Service.

Respectfully submitted,

_____

Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, Maryland 20772
(301)599-7620
(301)599-7623 (FAX)
Bar No. 14639