HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 7

```
1   A.          Any time, what?  Say again.
2   Q.          At any time in your life, did you ever
3   make a discussion with Mr. Hunt regarding selling
4   The Ritz Strip Club to Mr. Hunt?
5   A.          He came to the club one time to ask me
6   to sell it, but I remind him that, at that time,
7   that I didn't own it.  How can I sell when I
8   didn't own it?
9   Q.          Did you own the club in February?
10  A.          No.  The government seized it before
11  that.
12  Q.          When did--
13  A.          When arrest me, they seized the club.
14  Q.          Do you remember when the government
15  arrested you?
16  A.          Yes.  That was the day they seized my
17  club.  After that day, I didn't own it since.  On
18  the title is my name, but the U.S. government own
19  it.
20  Q.          Who is George Eichenberger?
21  A.          George Eichenberger, he's a real
22  estate agent.
23  Q.          And he was your real estate agent?
24  A.          He not my real estate agent.  He the
```

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 8

```
 1   only one guy that I know is, like, friend.  Not my
 2   real estate agent.
 3   Q.         Did you ever introduce
 4   George Eichenberger as your real estate agent to
 5   sell the club?
 6   A.         To who?
 7   Q.         To Mr. Hunt.
 8   A.         Never.
 9   Q.         Do you ever remember meeting me?
10   A.         I remember you, but I never introduce
11   you and Mr. Ron, but I don't know Mr. Ron, who he
12   is.  I don't know who he is until he stop by the
13   club.  He say he going to buy the club, then we
14   joking around when we drinking.  That's all.
15   Q.         Do you ever remember how many times
16   Mr. Hunt came to your club?
17   A.         I remember one time down in the bar
18   sit around the bar.
19   Q.         Do you remember Mr. Hunt actually
20   going up to your office and you having--
21   A.         That's the first time.  That's the
22   same time.  Up there and go downstairs.  That's
23   the only one time.
24   Q.         You don't remember him coming to the
```

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 12

1  here-- the contract right here, I never discuss
2  commission with my real estate agent. I don't
3  know how he come up with that idea that he get
4  commission from the buyer. I never discuss with
5  him commission, and I don't have a contract, the
6  letter intended for Mr. Ron and nobody else, at
7  that time, but he never mention about Mr. Ron
8  offer me any, any contract. I don't know nothing
9  about this.
10 BY MR. BELL:
11 Q.         Was he your agent?
12 A.         He just want to sell whenever I own
13 it, but it doesn't mean that he's my agent. He
14 just want to sell.
15 Q.         Isn't it a fact that--
16 A.         That he know that you know that I
17 didn't own the club, and he know that I didn't own
18 the club.
19 Q.         When didn't you own the club?
20 A.         The government arrest me for, that's
21 the day that my lawyer, Mr. Chuck, Mr. Chuck
22 Bernstein told me, "You cannot sell the club. You
23 didn't own the club no more," when he arrest me,
24 and I had to be swear in the court that you didn't

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 22

```
 1   A.          So that's what they say.  If you take
 2   the plea, they drop that one.  So I didn't-- I
 3   don't know what, but they say if you take plea, I
 4   drop that one.  They drop that one and they charge
 5   me for one count for conspiracy.
 6   Q.          And you were sentenced?
 7   A.          Yeah.
 8   Q.          Do you know what your sentence was?
 9   A.          Yeah, I do.  I know now.  Not at that
10   time, because I don't understand the court system.
11   I don't know anything about it.  My first time.
12   Q.          What are you sentenced to?
13   A.          Forty months.
14   Q.          Do you still communicate with George
15   Eichenberger?
16   A.          No, sir.
17   Q.          When was the last time you
18   communicated with George Eichenberger?
19   A.          The last time we talked to him when I
20   got here.  He's in here, too, but we don't talk.
21   Q.          He's in here, too?
22   A.          He's in here.  We don't talk.  We
23   don't talk each other.
24   Q.          Who is Linda Lee Buck?
```

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 23

1  A.         That's my friend. My girlfriend.
2  Q.         Your girlfriend.
3             Did you ever give Linda Lee Buck Power
4  of Attorney?
5  A.         Yes.
6  Q.         What was the management group that you
7  were dealing with after they seized The Ritz from
8  you?
9  A.         Management group?
10                MR. BELL: I want to mark this
11 as Exhibit No. 3.
12                      * * *
13                (Whereupon, Lee Exhibit No. 3 was
14 marked for identification purposes.)
15                      * * *
16 BY MR. BELL:
17 Q.         I'm going to read it to you. This is
18 from George--
19                MS. GRANTLAND: Did he answer
20 that question?
21                MR. BELL: What did you say?
22                MS. GRANTLAND: Did he answer
23 that question?"
24                MR. BELL: Yes, he did.

STRESKI REPORTING & VIDEO SERVICE 1-800-659-2249
Wheeling, WV  Morgantown, WV  Steubenville, OH  Pittsburgh, PA

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 26

```
 1  George Eichenberger, a letter dated June 13th,
 2  2002, "Reason, Ritz Cabaret, Dear Mr.
 3  Eichenberger, Please be advised that my client has
 4  authorized me to make an offer of $1.6 million
 5  plus a six percent buyer's premium for The Ritz
 6  Cabaret located at 504 South Broadway in
 7  Baltimore, Maryland.  Sincerely, Jimmy A. Bell,
 8  Esquire."
 9            Mr. Lee, have you ever seen that
10  document?
11  A.        No, sir.
12                 THE WITNESS: Brenda, all the
13  document he show me, I never seen with my eyes.
14                 MS. GRANTLAND: Okay.  Well,
15  I'm going to get copies of all of those and see if
16  I've ever seen them, since the case started.  Just
17  answer the questions.  That's all you have to do.
18  BY MR. BELL:
19  Q.        You said Linda Lee Buck had Power of
20  Attorney.
21  A.        Yes.
22                   * * *
23            (Whereupon, Lee Exhibit No. 5 was
24  marked for identification purposes.)
```

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 27

```
1                    *  *  *
2    BY MR. BELL:
3    Q.         This has been marked as Exhibit No. 5.
4    This is from George Eichenberger dated 6-15-02,
5    addressed to me.  "Dear Mr. Bell, I took your
6    offer to Linda Lee Buck who, at this time, is
7    appointed and has the Power of Attorney to handle
8    any of Francis Lee's business matters.  You can
9    reach Linda Lee Buck by phone at The Ritz,
10   410-327-0853, or at her cell phone, 410-230-5026,
11   or by fax at 410-238-7554.
12              "The offer from the other group that
13   is in at this time and who attempted to transfer
14   the liquor license without the seller's signature
15   is in limbo at this time.  We withdrew the
16   application of transfer and are waiting for the
17   next step.  Hopefully, their attorney is able to
18   void the signed contract.
19              "Since I'm going to be away to
20   recuperate from my operation on my spine, I won't
21   be able to assist you.  Just work with Linda Buck
22   Lee and the attorney she will use in this matter.
23   If the deal goes through and the buyer's premium
24   needs to be sent to Melvin Kodenski, 19 East
```

STRESKI REPORTING & VIDEO SERVICE 1-800-659-2249
Wheeling, WV  Morgantown, WV  Steubenville, OH  Pittsburgh, PA

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 28

1  Fayette Street, Baltimore, Maryland 21202.  He
2  represents me on all of my pending settlements.
3           "Good luck and remember this is not
4  going to happen overnight.  George Eichenberger."
5           Mr. Lee, have you ever seen that
6  document?
7  A.        I didn't see the document, but Miss
8  Linda Buck mention about that all to me at that
9  time.
10 Q.        So she did mention it to you?
11 A.        She mention about, yeah.
12 Q.        Tell me that conversation, to the best
13 of your recollection.
14 A.        She-- oh, my God.
15 Q.        Take your time.
16 A.        She told me that she got that contract
17 from Mr. George Eichenberger, the offer, like 1.6,
18 I believe.  That's what I believe.  He got it from
19 another offer.  So she say about-- we already take
20 the offer from $2.5 million and then go down to
21 1.6, so that's when I heard.
22 Q.        What $2.5 million?  You've lost me.
23 A.        The guy offer $2.5 million, Mr.
24 Dennis.

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 29

```
1                $2.5 million.
2   Q.           Offered it to who?
3   A.           Offered to us...
4   Q.           Okay.
5   A.           ...at that time, but not in a
6   contract.
7                Just talk.  Okay.
8                Then I locked up, so I don't know,
9   Then they come back and change it to $1.6 million.
10  That was the last time.  The contract, at that
11  time, is to take the contract for-- to fighting
12  forfeiture, the $ 1.6 million.
13  Q.           Do you know the name of that-- was
14  that with Phillip--
15  A.           Yes.
16  Q.           --Bass and Dennis Alvioni, spelled
17  A-L-V--
18  A.           Yes.  That's correct.
19  Q.           Work me through this process, so I can
20  understand.
21  A.           Okay.  First they make an offer, so I
22  take that offer to give to the lawyer so he going
23  to fight for the forfeiture, because we still
24  fighting at that time to keep the club in my name,
```

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 30

```
 1   but they took-- they seize it.
 2           When we talk, they say, "We offer $2.5
 3   million".  Okay.  That's what's they offer.  Was
 4   just talk.  Okay.  I believe that-- I don't
 5   remember I signed it or not.  Right now, I been
 6   two years.  I been in jail.  I don't remember.
 7           Then they come back.  They countered
 8   back with his lawyer say, "No.  That's too high."
 9   Then they offer $1.6 million.  That's the same day
10   I go to the court.  The same day I go to court.
11   So I even look.  I say, "1.6" so we say yes,
12   because my lawyer need that paper to go to court
13   for the government fighting for the forfeiture, at
14   that date.
15   Q.      So you signed a contract with them--
16   A.      At that day.
17   Q.      That day.
18   A.      The same day I go to court.  In the
19   morning.
20   Q.      Okay.
21   A.      The day or the day before.  I don't
22   remember now.
23   Q.      The day or the day before.  Okay.
24   A.      Yeah.
```

STRESKI REPORTING & VIDEO SERVICE 1-800-659-2249
Wheeling, WV  Morgantown, WV  Steubenville, OH  Pittsburgh, PA

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03  FRANCIS LEE

Page 31

1  Q.          So you actually signed a contract to
2  sell the club.
3  A.          I did.
4  Q.          Okay.
5  A.          Because my lawyer need that.  Need the
6  piece of paper to prove that the club worth that
7  much money.  The government cannot take my club
8  away from me when I took a little, small amount of
9  money and fine me for the big money.  You know,
10 200,000, $190,000, but take the club worth a
11 million dollar.  That's in the government law that
12 they cannot do that.
13           So my lawyer ask me, "You have to have
14 contract, any contract right now to prove that the
15 club worth that much money so the government
16 cannot take it.  If not, they going take it."
17           You know what I mean?  That would be
18 fighting the court, because I file bankruptcy
19 three time.  The club don't make no money.  How
20 can you sign that much the club?  You know what I
21 mean?  But I work hard for it.  That's what we're
22 fighting about the forfeiture.
23 Q.          So, at that time when you signed the
24 contract, you were signing the contract so that

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 32

1  you would be able to keep your club--
2  **A.          To keep it.**
3  Q.          --to keep the government from getting
4  more money from the sale of the club than the
5  money you said that you were involved-- I'm
6  unclear on that.
7              THE WITNESS: Miss Brenda, do
8  you understand what I say?
9              MS. GRANTLAND: What's the
10 question again? The question is very confusing.
11             Are you asking him for a legal
12 opinion, or what are you asking him for?
13             MR. BELL: No. I'm asking him
14 what happened. That's exactly what I'm asking
15 him.
16             A factual of what happened.
17             MS. GRANTLAND: Okay.
18             Could you ask the question again?
19 BY MR. BELL:
20 Q.          You stated that-- I'll try to do it
21 yes or no's.
22             The day before you went to court, or
23 the day that you went to court, you signed a
24 contract to sell your club for $1.6 million; is

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 33

```
 1   that correct?
 2                   MS. GRANTLAND:  Okay.  First
 3   of all--
 4                   MR. BELL:  There's a
 5   question--
 6                   MS. GRANTLAND:  -- facts in
 7   that question that have not been admitted.
 8                   MR. BELL:  There is a question
 9   on the table, and unless you can object, but under
10   these rules, under this circuit, he's required to
11   answer.
12                   MS. GRANTLAND:  I'm not saying
13   he's not required to answer--
14                   MR. BELL:  You can object--
15                   MS. GRANTLAND:  I'm objecting
16   to the form of the question.
17   BY MR. BELL:
18   Q.        Okay.
19             You can answer.
20   A.        I did sign the contract before to go
21   to court to prove that the club worth that much
22   money.
23   Q.        And that was your intent to sell them
24   the club; am I correct?
```

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 34

```
1   A.          Well, I-- say again.
2   Q.          Let me ask you a different way.
3               You signed a contract to sell Phillip
4   Bass, with Gabne and Dennis Alvioni.  You signed a
5   contract with them to sell the club for $1.6
6   million; is that correct?
7   A.          That's correct.
8   Q.          What happened after you signed the
9   contract?
10  A.          I go to court.
11  Q.          What happened then?
12  A.          We fighting for the forfeitures, and
13  the lawyer took the contract and being a witness
14  to standing in the court prove to the judge and
15  the prosecutor that the club worth that much
16  money. Another lawyer stand right there, they say
17  the club worth that much from the U.S. Marshall, I
18  guess.  I don't remember.
19  Q.          Do you remember what happened after
20  that?
21  A.          They take the club.  Doesn't matter.
22  The forfeiture-- they say because the action in
23  the club, they take the club.
24  Q.          Did you ever speak with any FBI agent?
```

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 42

```
 1                    MS. GRANTLAND:  I have some
 2   follow-up questions.
 3                      *  *  *
 4                  E X A M I N A T I O N
 5   BY MS. GRANTLAND:
 6   Q.          Mr. Lee, do you know the difference
 7   between a contract and an offer?
 8   A.          No.
 9   Q.          Were these contracts or offers that
10   you got from the-- from-- I can't think of the--
11   Phillip Gabne or Mr. Dennis, were those binding on
12   the government?
13   A.          Yes.
14   Q.          Yes?
15   A.          Say again.  I don't understand.
16   Q.          Do you know what "binding" means?
17   A.          What's that mean?  Explain.
18   Q.          Let me see if I can ask you a
19   question--
20               What effect did those contracts or
21   offers that you got have on the government?
22   A.          The contract I took from Mr. Dennis?
23   Q.          Uh-huh.
24   A.          I don't know.  It's a piece of paper
```

HUNT v. TRACEY'S, INC., t/a RITZ CABARET, et al. 11/19/03 FRANCIS LEE

Page 43

1   and I sign it.
2           MS. GRANTLAND:  Okay.  I don't
3   have any other questions.
4           MR. BELL:  His rights, do you
5   want me to do it on or off the record?  His rights
6   to waive or to sign it.
7           MS. GRANTLAND:  Let me just
8   tell you that we do not waive signature because
9   he's so hard to understand.  We want to make sure
10  that he can look those over, because he may have
11  been misinterpreted or misunderstood.
12          MR. BELL:  You have a right to
13  read the transcript.  The only thing that you
14  can-- you can't add to it. The only think you can
15  do is if she misspells a word or if there are
16  typographical errors, you can change that.
17          Your attorney has stated for the
18  record that you are going to go ahead and read.
19          THE WITNESS:  Yeah.  I would
20  like to read and know and understand that when you
21  talk, you know, the pronunciation sometimes.  I
22  can look in dictionary.
23          MR. BELL:  Thank you, Mr. Lee.
24          THE WITNESS:  Thank you, sir.

STRESKI REPORTING & VIDEO SERVICE 1-800-659-2249
Wheeling, WV   Morgantown, WV   Steubenville, OH   Pittsburgh, PA