## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **RON HUNT** : | |
| : | Civil Action No: L02-CV-2523 |
| Plaintiff, : | (WDQ) |
| : | |
| v. : | |
| : | |
| **TRACEY'S INC. t/a** : | |
| **RITZ CABARET** : | |
| : | |
| and : | |
| : | |
| **FRANCIS LEE** : | |
| : | |
| Defendants. : | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S PETITION FOR ATTORNEY'S FEES

COMES NOW Plaintiff Ron Hunt, by and through counsel Jimmy A. Bell, Esq. and the Law Office of Jimmy A. Bell, P.C., and respectfully submits this Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendant's Petition for Attorney's Fees.

For cause, Plaintiff states the following:

## STATEMENT OF FACTS

Plaintiff Ron Hunt is an African-American citizen of the United States and the owner of the Nexus Gold Club. From February of 2002 to May of 2002, Plaintiff Ron Hunt met with Defendant Francis Lee and his agent, Joerg Eichelberger, numerous times in order to discuss the purchase of the Ritz Cabaret by the Plaintiff. Plaintiff Hunt also submitted written offers to the Defendant for the purchase of the Ritz Cabaret. Mr.

Eichelberger specifically told Plaintiff Hunt no contingencies, including financing, would be accepted and that Plaintiff would have to pay $1.6 million to purchase the Ritz Cabaret in addition to a six percent (6%) buyer's fee. However, on May 22, 2002, Defendant Lee entered into a Contract of Sale with a non-African American purchaser which indeed contained contingencies and which did not include any provision for paying an additional six percent (6%) buyer's fee. Plaintiff believed that Defendant Lee not only discriminated against Plaintiff Hunt contractually, but also defamed Plaintiff Hunt to the employees of the Ritz Cabaret following Plaintiff Hunt's visits to the Defendant's establishment between February and May of 2002.

## ARGUMENT

In Arnold v. Burger King Corp., the court affirmed the lower court's decision awarding appellees attorney's fees on appellant's frivolous claim of racial discrimination where appellant was discharged solely due to his persistent harassment of female employees. 719 F.2d 63 (4th Cir. 1983). The Court stated that "[a] district court may in its discretion award attorneys' fees to a prevailing defendant in a Title VII case, upon a finding that the plaintiff's action was frivolous, unreasonable or without foundation." Id. at 65, citing Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978). In Christiansburg, the Supreme Court provided only general guidelines for awarding attorney's fees against plaintiffs. The court in Christiansburg specifically stated:

> These guidelines, although generally pointing to considerations similar to those which control substantive decision-making in Title VII cases, emphasize the potential chilling effect fee awards may have on plaintiffs. The Supreme Court, for example, identified the fee award as a conservative tool, to be used sparingly in those cases which the plaintiff presses a claim which he knew or should have known was groundless, frivolous or unreasonable. Id. at

2

421.  It directed the district court to be particularly sensitive to the broad remedial purposes of Title VII and the danger that attorneys' fee awards in favor of defendants can discourage "all but the most airtight claims." Id. at 422. Finally, it cautioned against *post hoc* reasoning which presumes the merits of the claim to attorneys' fees from the outcome of the case. Id.

As this Court never stated that Plaintiff's claims were groundless, frivolous, unreasonable or made in bad faith, this Court should not award attorney's fees to Defense Counsel in this matter.  Neither is there evidence in this case which could lead this Court to conclude that Plaintiff pressed claims which he knew to be groundless, frivolous, unreasonable, or made in bad faith given the fact that Plaintiff had affidavits, letters, a signed contract, and the testimony of the Defendant himself which tended to support Plaintiff's claims of contractual discrimination based on race.  An award of attorney's fees in this matter would therefore fly in the face of the Supreme Court's advice to award attorney's fees "sparingly in those cases which the plaintiff presses a claim which he knew or should have known was groundless, frivolous, or unreasonable."  Id. at 422.  Moreover, while Defendant would have this Court believe that he is entitled to attorney's fees simply because he prevailed on summary judgment, this is not true.  The Christiansburg court specifically cautioned against "*post hoc* reasoning which presumes the merits of the claim to attorneys' fees from the outcome of the case."  Id.

Title 28 U.S.C. §1927 states that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  However, in the unpublished opinion of Harshbarger v. Prof'l

Evaluation Group, Inc. (In re Gould), 77 Fed. Appx. 155 (2003), the district court's award of attorney's fees against one of the plaintiff's attorney (Schewe) under 28 U.S.C. §1927 for multiplying the proceedings was vacated on the grounds that the attorney was not given proper notice, in violation of his due process rights. "Like other sanctions, attorney's fees should not be assessed lightly or without fair notice . . . ." Id. at 161, citing Roadway Express, Inc. v. Piper, 447 U.S. 752, 767 (1980). See also Kunstler v. Britt, 914 F.2d 505, 522 (4th Cir. 1990) (reversing Rule 11 sanctions against plaintiff's attorneys because they were not given adequate opportunity to respond to defendant's previously submitted fee statements as required by due process). As Schewe was not given proper notice, and no opportunity to oppose the sanctions, the Court of Appeals vacated the imposition of attorney's fees and costs against Schewe. Similarly, as the Plaintiff in the above-captioned matter was only notified that Defense Counsel was seeking attorney's fees with the filing of Defendant's Petition for Attorney's Fees with this Court, although mandatory LR 109 required Defendant to inform Plaintiff that he would be seeking attorney's fees and to further submit quarterly statements to the Plaintiff, the awarding of attorney's fees should be denied as Plaintiff was not given proper notice.

In attempting to bolster its contention that attorney's fees should be awarded, Defendant cites Blanchard v. Bergeron, 489 U.S. 87 (1989). However, that case, which dealt with a §1983 claim based on the plaintiff's allegations that he had been beaten by the sheriff's deputy, can be appropriately distinguished from our own case which deals with §1981 contractual discrimination based on race. Furthermore, the Blanchard court was tasked with determining whether or not the plaintiff's contingent-fee arrangement with his attorney served as a cap on the amount of attorney's fees which could be

awarded, wherein this Court is tasked with determining whether or not attorney's fees are appropriate at all.

Defendant further cites Hensley v. Eckerhart for the proposition that:

> A prevailing Defendant may recover an attorney's fee only where the suit was vexatious, frivolous, or brought to harass or embarrass the Defendant.  See H.R. Rep. No. 94-1558, p.7 (1976); *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978) ("[A] district court may in its discretion award attorney's fees to a prevailing Defendant in a Title VII case upon a finding that the Plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith").  461 U.S. 424, 429 n. 2 (1983).

In Hensley, suit was brought against hospital officials on behalf of all patients who had been involuntarily confined to the forensic unit of the hospital, alleging unconstitutional treatment and conditions.  461 U.S. 424 (1983).  The District Court found constitutional violations in five of the six general areas of treatment and awarded attorney's fees on all issues, including that on which plaintiffs did not prevail.  The Court of Appeals remanded the case to the District Court to determine which fees were reasonable in light of the fact that plaintiffs were not successful on all claims.  Id.  Our case, however, does not deal with the constitutionality of treatment and conditions in the forensic unit of any hospital, nor does it deal with the determination of attorney's fees based on partial success of the prevailing party.  Moreover, at no time did this Court state that Plaintiff's claims against the Defendant were frivolous, unreasonable, without foundation, or made in bad faith.  This Court was in the best position to determine whether or not Plaintiff's case was frivolous, unreasonable, without foundation, or made in bad faith, but instead this Court allowed discovery based on affidavits, letters, and the signed contract provided to this Court by the Plaintiff.  If Plaintiff's case was groundless,

this Court would not have extended discovery. This Court had the ability to dismiss this case from the very beginning and chose not to do so.

## I.    RULES AND GUIDELINES FOR DETERMINING LODESTAR ATTORNEY'S FEES IN CIVIL RIGHTS AND DISCRIMINATION CASES

Rule 109 of the United States District Court for the District of Maryland states that "[a]ny motion requesting the award of attorneys' fees must be supported by a memorandum setting forth the nature of the case, the claims as to which the party prevailed, the claims as to which the party did not prevail, a detailed description of the work performed broken down by hours or fractions thereof expended on each task, the attorneys' customary fee for such like work, the customary fee for like work prevailing in the attorney's community, a listing of any expenditures for which reimbursement is sought, any additional factors which are required by the case law, and any additional factors that the attorney wishes to bring to the Court's attention. Any motion for attorneys' fees in civil rights and discrimination cases shall be prepared in accordance with the Rules and Guidelines for Determining Lodestar Attorneys' Fees in Civil Rights and Discrimination Cases that are an appendix to these Rules." D. Md. LR 109.

Appendix B of the Rules of the United States District Court for the District of Maryland are "[m]andatory rules regarding billing format, time recordation, and submission of quarterly statements" and "apply to cases in which a prevailing party would be entitled to reasonable attorneys' fees under 42 U.S.C. section 1988(b)." D. Md. Appx. B. Appendix B further states that "Counsel for a party intending to seek fees if the party prevails shall submit to opposing counsel quarterly statements showing the amount of time spent on the case and the total value of that time. These statements need not be in the "litigation phase" format provided in Guideline 1.b or otherwise reflect how time has

been spent. The first such statement is due at the end of the first quarter in which the action is filed." Id. at c.

While the Defendant complied with the first half of Rule 109 which requires Defendant to set forth the nature of the case, the claims to which Defendant prevailed, claims as to which Defendant did not prevail, detailed description of work performed, attorney's customary fee, and a listing of expenditures for which reimbursement is sought, the Defendant completely disregarded the portion of the Rule which specifically states that "Counsel for a party intending to seek fees if the party prevails shall submit to opposing counsel quarterly statements showing the amount of time spent on the case and the total value of that time. These statements need not be in the 'litigation phase' format provided in Guideline 1.b or otherwise reflect how time has been spent. The first such statement is due at the end of the first quarter in which the action is filed." Id.

Defense Counsel completely failed to submit quarterly statements to opposing counsel showing the amount of time spent on the case and the total value of that time although this submission was required by Rule 109. Moreover, Plaintiff did not receive the first statement which was due at the end of the first quarter in which the action was filed or any subsequent statements at the end of any subsequent quarters while the action was pending, although these submissions were also mandatory under Rule 109. In fact, Plaintiff's first notification that Defense Counsel was seeking attorney's fees was with the filing of Defendant's Petition for Attorney's Fees with this Court. Although Defendant has failed to comply with the mandatory rules of this Court, Defendant is nonetheless asking this Court to circumvent mandatory protocol and award attorney's fees. As such, Defendant's Petition for Attorney's Fees should be denied as frivolous for

failing to comply with Rule 109 which is explicitly labeled as a mandatory prerequisite to obtaining an award for attorney's fees.

## II.    STANDARD FOR RULE 11 SANCTIONS

While Defendant's document is titled "Petition for Attorney's Fees," Defendant attempts to convince this Court that Plaintiff is in violation of Rule 11 and "should be ordered to show cause as to why sanctions should not be imposed upon him for violating this rule." Defendant's attempt to seek Rule 11 sanctions against Plaintiff in a document titled "Petition for Attorney's Fees" is improper. Furthermore, according to the Federal Rules, a motion for sanctions under Rule 11

> shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but **shall not** be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Fed. R. Civ. P. 11 (emphasis added).

While Defendant has attempted to describe the conduct which he believes warrants Rule 11 sanctions, Defendant failed to comply with the second half of the Rule which specifically states that the motion or request "**shall not** be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." Id. (emphasis added). Defendant made no attempt whatsoever to serve Plaintiff with any motion or request for sanctions prior to requesting that this Court order Plaintiff to show cause as to why he should not

be sanctioned.  In fact, the Plaintiff's first notification that Defense Counsel was seeking

attorney's fees was with the filing of Defendant's Petition for Attorney's Fees.  This is in

direct violation of the protocol outlined in Fed. R. Civ. P. 11, and for this reason,

Defendant's cloaked request for sanctions should be denied as frivolous.

**III.    PLAINTIFF'S CASE WAS NOT FRIVOLOUS AT THE TIME OF FILING NOR CAN PLAINTIFF'S CASE NOW BE CLASSIFIED AS FRIVOLOUS AS PLAINTIFF HAD SUBSTANTIAL EVIDENCE TO CORROBORATE HIS CLAIMS OF DISCRIMINATION**

The Supreme Court recently held that a heightened pleading standard shall not be

applied to discrimination cases. <u>Swierkiewicz v. Sorema</u>, 122 S. Ct. 992, 998 (2002).

According to the Supreme Court, Plaintiff Hunt needed only provide a short and plain

statement of the claim showing that [he] is entitled to relief."  Id., quoting Fed. R. Civ. P.

8(a)(2).  While Defendant would have this Court believe that Plaintiff's suit was

meritless, Plaintiff provided more than the requisite "short and plain statement" of his

claim, and in fact did not file suit until after he had substantiated his claims with

affidavits from two of Defendant's former employees, a sale of contract, and letters from

Defendant's agent.  Thus, Defendant's claim that Plaintiff's lawsuit was frivolous is

without basis in truth or fact.

    **A.    <u>Plaintiff filed suit after obtaining two affidavits from two former employees of Defendant who attested to Plaintiff's claims of racial discrimination.</u>**

Defendant Lee's specific discriminatory statements were detailed as follows in the

affidavit of Nicole Fuoco, Defendant's former employee:

      I, Nicole Fuoco of 365 Montocello Court, Glen Burnie, 21061 being duly sworn state the following regarding my experiences as Bartender at the Ritz Cabaret of Baltimore, Maryland and my knowledge regarding the comments made by Mr. Lee about Ron Hunt.  I was a

bartender for the Ritz, bartenders are the management, we are responsible for running the club. Before I became a bartender I was a dancer there for two years.

When I first encountered Ron Hunt, I was working and he tipped me fifty dollars. I did no know who he was at the time. He came into the club two times after that. The second time I saw Ron talking with Mr. Lee about purchasing the club. They were in meetings all day discussing the club. The next time Ron came in he did not meet with Mr. Lee, but he did bring some of his dancers with him.

After I saw Ron and Mr. Lee discussing the sale of the club, I asked Mr. Lee if he was going to sell the club and he said no. He also said that he didn't want to sell the club to Ron because he was too arrogant and he was always throwing his money around. He kept saying that he did not want Ron changing anything and that Ron wouldn't treat "his family" right. Mr. Lee said that Ron was cocky and arrogant, and that Ron didn't trust his employees the way that Mr. Lee did. He also said that because Ron was so arrogant, he felt like Ron would "treat his girls bad" and that Ron would bring the club down. But I think that it would be good if Ron took over the club and cleaned it up.

The Ritz is a nasty place to work. I was constantly using hand sanitizers to keep myself clean. I remember when the Health Department came and could have shut the Ritz down. You're not supposed to keep anything in with the ice, but there were always sodas, champagne, and beer in with the ice. The Health Department also cited the Ritz because they could not find a hand washing sink behind the bar because it was covered by a bunch of dirty rags. They probably would have shut the club down, but they couldn't find the biggest violation. There is a basement in the Ritz, but there is a separate entrance outside on another building. That's where the septic tank is, and it's broken. It's been broken. Whenever you flush a toilet in the club, it goes into the basement. There is knee deep waste in the basement. At one point, Mr. Lee was letting it out onto the street until people started complaining. Even with the septic tank being broken, Mr. Lee still won't hire a professional to fix anything.

The club is not secure either. There is a doorway in the back of the club that doesn't have a door. Not many people know about it, but anyone can hop a few fences and then come into the club through that entrance. I've been robbed before where someone came in through that

entrance as well.  Junkies have come into the club through
that entrance as well.  Mr. Lee even had one living in the
club and paid him to clean behind the bar.  He was a
heroine addict and had open sores on his arms and face.
Even with the open sores, Mr. Lee let him stock glasses and
beer.

A lot of drug dealers frequent the club and a lot of
girls do drugs.  There was one girl who use [sic] to leave
needles around the club, laying on the floors.  I also
remember when I was running the day shift, I had to fire
two girls for prostitution.  And it was with the same guy I
had previously told the bouncers to watch.  The first girl
had unprotected sex with the man, in the club, and the other
girl gave him oral sex in the club.  I fired them both when I
found out what took place.

Mr. Lee stated that he wanted Dennis, who is white,
to own the club.  Exhibit A, Affidavit of Nicole Fuoco.

In yet another affidavit, Mr. Lee's discriminatory statements concerning Plaintiff

Hunt were further detailed:

I, Megan E. Mattson, of 9160 Bourbon Street,
Apartment L, Laurel, Maryland 20723 being duly sworn
state the following regarding my knowledge of the
statements made by Mr. Lee, owner of the Ritz Cabaret
located on South Broadway in Baltimore, Maryland,
regarding Ron Hunt, owner of the Nexus Gold Club and
prospective buyer of the Ritz Cabaret.

On one particular day in May, 2002, Ron Hunt
came to the Ritz Cabaret to discuss the purchase of the club
with the owner, Mr. Lee.  I did not personally see Mr. Hunt
come into the club that night because he had already left by
the time that I arrived, but I was made aware of his visit by
one of the bartenders who was commenting about how
much money she had made on account of Mr. Hunt.  The
bartender specifically mentioned to me that Mr. Hunt had
come into the Ritz Cabaret to talk to Mr. Lee about buying
the club.

After speaking with the bartender, I went to place
my name on the dance board.  At this moment, I
encountered Mr. Lee who was seated near the dance board
as usual.  I asked him: "Who's gonna buy the club?"  He
responded: "That cocky, arrogant motherfucker will never
get this club."  Mr. Lee then continued by stating that Mr.
Hunt would never be able to keep the in the condition that

it was in and that Mr. Hunt would not be able to keep the club up and running. He said that Mr. Hunt could not keep the club open for a month. He said that the Ritz was an upscale place and that Mr. Hunt was going to bring the club down. He also said that Mr. Hunt would bring a lower class of clientele. I knew that Mr. Lee was referring to Ron Hunt because Mr. Hunt was the only person who had come in to discuss the purchase of the club that particular day. Although I never personally saw any other buyers come into the club, I knew from other employees at the Ritz Cabaret that there were other persons who had come into the club looking to buy it. I have never heard Mr. Lee make comments about any other buyer, besides Mr. Hunt, that has come into the club looking to purchase it. Exhibit B, Affidavit of Megan Mattson.

**B.**     **Plaintiff's own affidavit attests to the fact that Plaintiff attempted to negotiate the purchase of the Ritz Cabaret with the Defendant who subsequently accepted a less favorable offer from a non-African American purchaser.**

I, Ron Hunt, of 1200 Golf Course Drive, Mitchellville, Maryland 20721, being duly sworn state the following regarding my experiences with Francis Lee. I initiated communications with Mr. Lee and Joerg Eichelberger, Mr. Lee's agent, concerning the purchase of the Ritz Cabaret and all of it's [sic] licenses in February of 2002. I had a closed door face to face meeting with Mr. Lee in February 2002. I also met with Mr. Lee and Mr. Eichelberger together approximately three times Between [sic] February 2002 and May 2002. On those occasions I met with Mr. Lee and Mr. Eichelberger at the Ritz Cabaret in Baltimore, and on one occasion I met with Mr. Lee and Mr. Eichelberger at my place of business, the Nexus Gold Club in Washington, D.C. During each meeting we discussed the price, and terms of sale, for the Ritz Cabaret and all of its licenses. Additionally, I submitted my offers in writing to Mr. Lee's agent.

In response to my inquiries concerning the purchase of the Ritz Cabaret and all of it's [sic] licenses, Mr. Lee revealed to me that he had federal criminal legal problems. Mr. Lee stated that the federal government was allowing him to sell the Ritz Cabaret in order to settle his debts. Mr. Stated that if he did not sell it himself, the government would sell it and he would loose [sic] money. Mr. Lee did

not disclose the name of who the federal government
official who was authorizing him to sell the Ritz Cabaret
and all of its licenses.  At no time did Mr. Lee or his agent
indicate that Mr. Lee was not in a position to enter into a
contract for the sale of the Ritz Cabaret.  In fact, on May
22, 2002, Mr. Lee entered into a signed Contract of Sale
with Philip Bast Gagne and Dennis Alviani, which
purported to transfer ownership of the Ritz Cabaret to those
named individuals.  This contract was even filed with the
Baltimore City Liquor Board, for the purpose of
commencing the license transfer process.  Exhibit C,
Affidavit of Ron Hunt.

**C.**    **While the Defendant claims that the Plaintiff's suit was frivolous,
Defendant has provided this Court with no legitimate non-
discriminatory reason for denying Plaintiff the ability to buy the
Defendant's business given the fact that Plaintiff's offer was more
favorable to the Defendant than the offer the Defendant agreed to.**

The Contract of Sale entered into between Defendant Lee, Philip Bast Gagne and

Dennis Alviani on May 22, 2002 for $300,000.00, which purported to transfer ownership

of the Ritz Cabaret from Defendant Lee to Gagne and Alviani, contradicts Defense

Counsel's contentions that Plaintiff's lawsuit was frivolous.  This Contract specifically

stated: "Seller agrees to sell to Buyer and Buyer agrees to buy from Seller a parcel of

improved real estate located in Baltimore City, Maryland and known as 504 S Baltimore

Street, Baltimore, Maryland 21231 ("the Property") upon the terms and conditions set

forth in this Agreement."  Exhibit D, Contract of Sale.  Defendant Lee entered into yet

another contract on May 22, 2002, an Agreement of Sale of Assets for $1,300,000.00, in

his capacity as President of Tracey, Inc., between Tracey, Inc., Gagne and Alviani.  This

second contract specifically stated:

Seller hereby bargains and sells unto Buyer and the latter
does hereby purchase from the former, the aforementioned
business, free from all liabilities, debts, mortgages, security
interests, liens, and encumbrances whatsoever, and all of
Seller's rights, title and interests in the business conducted

13

> on the premises, including, but not limited to the existing
> alcoholic beverage license, the existing entertainment
> license, all equipment and fixtures, an itemized list of
> which is attached hereto and a part hereof as Schedule A,
> the goodwill, all customer contracts, all advertising
> contracts, the stock, inventory, existing telephone numbers,
> signs, the right to continue to trade on the premises under
> any trade name now used by the Sellers and all other assets
> of whatsoever nature pertaining to the business. *Exhibit E*,
> Agreement of Sale of Assets.

These May 22nd contracts were clearly entered into by Defendant Lee **after** the

Preliminary Forfeiture Order was entered on April 10, 2002. These contracts lent

credence to Plaintiff Hunt's statements that Defendant Lee informed him that he had been

given special permission by the United States government to sell the Ritz Cabaret to pay

his debts, and that Defendant Lee indeed had an agreement with the federal government

to sell the Ritz Cabaret. See generally Exhibit C, Affidavit of Ron Hunt. It was not

unreasonable for Plaintiff to conclude that Defendant had authority to sell the Ritz

Cabaret as he signed an agreement with another party to do just that. The May 22, 2002

contracts further suggested that the Preliminary Forfeiture Order was simply

"preliminary" as the title of the Order and the fact that a Final Forfeiture Order (see

generally Exhibit F, Final Forfeiture Order) was not entered until August 30, 2002 both

suggest.

Moreover, Plaintiff Hunt communicated with Defendant Lee and Defendant's

agent, Joerg Eichelberger, numerous times between the months of February 2002 to May

2002, for the sole purpose of inquiring about the purchase of the Ritz Cabaret. Plaintiff

Hunt also made several offers to purchase the Ritz Cabaret. On April 4, 2002, the letter

from Plaintiff Hunt's attorney to Mr. Eichelberger stated: "Please be advised that my

client has authorized me to make an offer of $1.5 million dollars for the property

referenced above."  Exhibit G, Letter from Jimmy A. Bell, Esq. to Joerg Eichelberger

dated April 4, 2002.  In response to Plaintiff Hunt's offer, Mr. Eichelberger stated:

> Thank you for the offer you made for the Ritz Cabaret
> yesterday via Fax.  The offer was declined by the seller.
> Like I told you the only reason we [sic] still talking with
> the prospective buyer's [sic] is, because of the offer that
> was accepted has a contingency of financing.  The seller
> will entertain other cash offers, of the prospective buyer is
> willing and able to close the deal within a reasonable time.
> There is a 6% (Six per cent) buyers fee (Commission)
> added to the purchasing price.  If you and your buyer is
> [sic] still interested in negotiating, I would suggest a
> meeting with you, the buyer and myself.
>
> FYI: The seller has the authorization to sell the business
> and the property, including all of the Licenses, we have to
> submit the offer to the Fed's for the final approval, who in
> turn will release the liens that they have at this time.
> Exhibit H, Letter from Joerg Eichelberger to Jimmy A.
> Bell, Esq. dated April 5, 2002.

Mr. Eichelberger's own words lent further credence to Plaintiff Hunt's statements that

Defendant Lee had been given special permission by the United States government to sell

the Ritz Cabaret to pay his debts.  See generally Exhibit C, Affidavit of Ron Hunt.  It also

verified Plaintiff Hunt's claims that he was subjected to additional terms, such as a six

percent buyer's premium, which the non-African American purchaser of the Ritz Cabaret

was not subjected to in the May 22, 2002 contract.  Id.

On May 22, 2002, Plaintiff Hunt contacted Mr. Eichelberger via his attorney to

request specific information about the Ritz Cabaret to provide to his bank for financing

purposes.  See Exhibit I, Letter from Jimmy A. Bell, Esq. to Joerg Eichelberger dated

May 22, 2002.  In response to this letter, Mr. Eichelberger stated:

> Since the Federal Government has seized the Ritz and all of
> the records there is nothing that we can provide you with,
> that would help your client to obtain financing from a bank.

> The way it works is the same as I told you before, any legit
> contract is forwarded to the Federal Government, they will
> investigate the person or group to see if there [sic] are
> qualified to purchase the Ritz.  No contingencies are
> accepted especially financing.  Its basically like a auction,
> the best party qualified wins the bid.  Plus there is a 6%
> buyer premium added to the purchase price payable to:
> Joerg Eichelberger/Realtor, Att: Melvin Kodenski, Esq., 19
> East Fayette Street, Baltimore, MD. 21202…Since Mr. Lee
> is temporarily under medical care (2 weeks) and the federal
> Government is not interested in running the Club, Lee's
> business partner is managing the Club with our help and 2
> Managers.  Exhibit J, Letter from Joerg Eichelberger to
> Jimmy A. Bell, Esq. dated May 28, 2002.

Again, Mr. Eichelberger's own words lent credence to Plaintiff Hunt's statements that

Defendant Lee had been given special permission by the United States government to sell

the Ritz Cabaret to pay his debts.  See generally Exhibit C, Affidavit of Ron Hunt.  It also

verified Plaintiff Hunt's claims that he was subjected to additional terms, such as a six

percent buyer's premium and the disallowance of a contingency, which the non-African

American purchaser of the Ritz Cabaret was not subjected to in the May 22, 2002

contracts.  Id.

On June 7, 2002, Plaintiff Hunt made another offer to Defendant Lee for the

purchase of the Ritz Cabaret.  The letter detailing this offer stated: "Please be advised that

my client has authorized me to make an offer of $1.6 million dollars for the Ritz Cabaret

located at 504 South Broadway in Baltimore, Maryland."  Exhibit K, Letter from Jimmy

A. Bell, Esq. to Joerg Eichelberger dated June 7, 2002.  In response to this letter, Mr.

Eichelberger stated:

> The feds approved the management group the [sic] Lee was
> dealing with over the last few month's [sic], as you can see
> in this mornings Sun Paper, Maryland section page 5B,
> they advertise the transfer of the Liquor License on 504 S.
> Broadway.

16

> Since we never know that any deal goes thru, until the
> check clears, I will forward your clients offer, but first you
> have to make a change. I informed you before, any offer
> that's made you have to add a Six per cent (6%) buyers
> premium. Please make you [sic] change and fax it to me
> and send a hard copy to me by mail. Exhibit L, Letter from
> Joerg Eichelberger to Jimmy A. Bell, Esq. dated June 8,
> 2002.

Upon being notified by Defendant Lee and Mr. Eichelberger that offers to

purchase the Ritz Cabaret would not be considered minus a six percent buyer's premium,

a provision which the non-African American purchaser of the Ritz Cabaret was not

subjected to, Plaintiff Hunt's attorney sent a letter to Mr. Eichelberger, stating: "Please be

advised that my client has authorized me to make an offer of $1.6 million dollars plus a

six percent (6%) buyer's premium for the Ritz Cabaret located at 504 South Broadway in

Baltimore, Maryland. Exhibit M, Letter from Jimmy A. Bell, Esq. to Joerg Eichelberger

dated June 13, 2002. In response to Plaintiff Hunt's offer, Mr. Eichelberger stated:

> I took your offer to Linda Lee Buck, who at this time is
> appointed, and has the Power of Attorney to handle any of
> Francis Lee [sic] business matters.
>
> You can reach Linda Lee Buck by phone at the Ritz (410)
> 327-0853 or at her cell phone (410) 230-5026 or by Fax at
> (410)-238-7554. The offer from the other Group that is in
> at this time and who attempted to transfer the Liquor
> License without the seller's signature is in limbo at this
> time, we withdrew the application of the transfer, and
> waiting for the next step. Hopefully the attorney is able to
> void the signed contract. Since I'm going to be away to
> recuperate from my operation on my Spine, I won't be able
> to assist you, just work with Linda Lee Buck and the
> Attorney she will use in this matter. If the deal goes thru
> the buyers premium needs to be sent to Melvin Kodenski,
> 19 East Fayette Street, Baltimore, Md. 21202, he represents
> me on all my pending, [sic] settlements's [sic]. Exhibit N,
> Letter from Joerg Eichelberger to Jimmy A. Bell, Esq.
> dated June 15, 2002.

Again, Mr. Eichelberger's own words verified Plaintiff Hunt's claims that he was subjected to additional terms, such as a six percent buyer's premium, which the non-African American purchaser of the Ritz Cabaret was not subjected to in the May 22, 2002 contract. See generally Exhibit C, Affidavit of Ron Hunt.

At no time did Defendant Lee or Mr. Eichelberger inform Plaintiff Hunt that Defendant Lee lacked the capacity to enter into a binding contract to sell the Ritz Cabaret. In fact, the words and representations of both Defendant Lee and his agent, Mr. Eichelberger, plainly suggested that Defendant Lee was given special permission by the Federal Government to sell the Ritz Cabaret, and was denying Plaintiff the opportunity to purchase the Ritz Cabaret on the basis of what Plaintiff believed was racial animus.

The Plaintiff was entitled to pursue his claim in a court of law, win or lose, that is the American way. Moreover, at no time did this Court state that Plaintiff's claims against the Defendant were frivolous or made in bad faith. This Court was in the best position to determine whether or not Plaintiff's case was frivolous or made in bad faith, yet this Court allowed discovery based on affidavits, letters, and the signed contract provided to this Court by the Plaintiff. If Plaintiff's case was groundless, this Court would not have extended discovery. This Court had the ability to dismiss this case from the very beginning and chose not to do so. However, Defendant's Petition for Attorney's Fees is attempting to second-guess this Court's previous decisions and now tell this Court what to do.

As Plaintiff had numerous documents to support his claims, it cannot be said that Plaintiff filed suit without any evidence to support his causes of action, it cannot be said that Plaintiff filed suit without performing adequate research, it cannot be said that

Plaintiff continued litigating after it became clear his case was frivolous, nor can it be said that Plaintiff's actions needlessly multiplied Defendant's attorney's fees.  As such, Defense Counsel's request to be awarded attorney's fees under §1988 should be denied.

**IV.    DEFENSE COUNSEL'S REQUEST THAT PLAINTIFF'S COUNSEL BE ORDERED TO PAY A PORTION OF DEFENSE COUNSEL'S ATTORNEY'S FEES "TO DETER HIM FROM STIRRING UP MORE FRIVOLOUS LITIGATION IN THE FUTURE" IS A BLATANT ATTEMPT TO TARNISH PLAINTIFF'S COUNSEL'S REPUTATION WITH FALSITIES AND UNTRUTHS**

In attempting to garner support for the argument that a portion of Defendant's attorneys' fees should be paid by Plaintiff's Counsel, Defense Counsel seemingly mocks the website of Plaintiff's Counsel and falsely characterizes other civil rights cases in which Plaintiff's Counsel has been counsel of record as being frivolous.

**A.    <u>In an attempt to tarnish the reputation of Plaintiff's Counsel to support the Petition for Attorney's Fees, Defense Counsel falsely suggests that Plaintiff's Counsel's portrayal of himself as a "prominent civil rights attorney" is misrepresentative of his true qualifications.</u>**

Defense Counsel stated: "[A]n investigation of Mr. Bell's background shows a pattern of similar abuses in all of his reported cases./To make matters worse, Bell holds himself out to be a prominent civil rights lawyer.  On his website Bell proclaims:

> Attorney Bell has swiftly become one of the nations leading Civil Rights and Entertainment attorneys.  The charismatic lawyer has already begun to teach this generation how to continue the fight that so many of our parents, grandparents and great-grand parents fought.

While it is unclear how or why the website of Plaintiff's Counsel is at issue in this matter as the above-captioned case is between Plaintiff Hunt and Defendant Francis Lee, it appears to Plaintiff's Counsel that Defense Counsel is downplaying the qualifications of

Plaintiff's Counsel and attempting to tarnish Plaintiff's reputation.  While two paragraphs of text in Defense Counsel's Petition for Attorney's Fees were devoted to listing Defense Counsel Grantland's experience and expertise, Defense Counsel failed to tell this Court that Plaintiff's Counsel has a lengthy resume of his own.

Specifically, Attorney Bell served as an adjunct professor at Anne Arundel Community College.  The 2000 Redeem the Dream March, sponsored by the SCLC and the National Action Network featured Attorney Bell and Attorney Johnny Cochran. Attorney Bell was the Keynote Speaker at the 2001 Martin Luther King, Jr. Celebration at the Civil Rights Institute in Birmingham, Alabama, where he received the "Dr. Martin Luther King, Jr. Award" for his legal work in the field of civil rights.  Attorney Bell has served as Legal Counsel to the Maryland State Conference of NAACP Branches as well as Legal Counsel for the Illinois State Conference of NAACP Branches.  Attorney Bell has further served as General Counsel for the Prince George's County Chapter of the SCLC, and Legal Counsel to the Most Worshipful Prince Hall Grand Lodge for the District of Columbia.

In March of 2001, Attorney Bell received a "Commendation" from the Governor of California for his work as a civil rights and entertainment attorney.  In September of 2000, he received a "Proclamation" from the City of District Heights, Maryland, for his legal work in the field of civil rights and his work with the youth.  On January 28, 2002, Attorney Bell received a "Resolution" from the Maryland State Senate for his "nationally recognized racial profiling litigation that has successfully ranged from affecting public policy to changing the culture of multi-national corporations."  In June of 2001, Attorney Bell won the first Federal Temporary Restraining Order for Racial Profiling of Black

Motorists in the country against the City of Rock Island, Illinois.  In July of 2001, Attorney Bell trained the entire police department for the City of District Heights, Maryland, on racial profiling.  On May 3, 2002, Attorney Bell became an official part of American History when he was recognized by the United States House of Representatives in the Congressional Record as a "charismatic, captivating attorney and civil rights champion and leader in the fight against racial injustice in our country" and called an "American Hero."  On July 2, 2002, Attorney Bell received a "Resolution" from the District of Columbia City Council for his work as a Civil Rights Attorney.  On June 3, 2002, Attorney Bell received a "Resolution" form the City Council of Baltimore, Maryland, for his "Outstanding Accomplishments as a Civil Rights and Entertainment Attorney that has affected public policy and uplifted the community."  And most recently, on July 28, 2003, Maryland Governor Robert L. Ehrlich, Jr. appointed Attorney Bell to the Appellate Court Judicial Nominating Commission.

As can be clearly noted, Defense Counsel's suggestion that Attorney Bell is falsely touting himself as a "prominent civil rights attorney" is clearly without any basis in truth or fact.

**B.  In an attempt to tarnish the reputation of Plaintiff's Counsel to support the Petition for Attorney's Fees, Defense Counsel falsely characterizes six cases in which Attorney Bell was counsel of record as being frivolous.**

Defense Counsel further states: "Bell's reported federal cases on Lexis do not paint such a rosy picture of him.  The Lexis' federal database contains six reported cases in which Jimmy A. Bell is listed as attorney of record for Plaintiff."  Defense Counsel further goes on to list those six cases.  For the record, there are twenty-six (26) cases listed on Pacer for the United States District Court for the District of Maryland, and

thirty-five (35) cases listed on Pacer for the United States District Court for the District of

Columbia which list Attorney Bell as counsel of record.  Out of these sixty-one (61)

cases, Defense Counsel chose to list and mischaracterize six of these cases in an attempt

to place Plaintiff's Counsel in an unfavorable light before this Court.  As Defense

Counsel ignored over ninety percent (90%) of the cases in which Plaintiff's Counsel is

listed as counsel of record, Plaintiff's Counsel will deal directly with the cases that

Defense Counsel chose to discuss.

For the first case, Defense Counsel stated: "*Brown v. Dorsey & Whitney*, 267 F.

Supp. 2d 61 (D.D.C. 2003) was dismissed because the Plaintiff's employment contract

required binding arbitration."  Petition for Attorney's Fees, p. 11.  What Defense Counsel

interestingly failed to tell this Court, however, is that the Court's Order granting

Defendant's Motion to Dismiss was conditioned on Defendant stipulating to "waive the

prohibition against plaintiff's recovery of punitive damages in arbitration contained in its

dispute resolution policy, its agreement to permit plaintiff to pursue her statutory

remedies available to her pursuant to the District of Columbia Human Rights Act, and its

agreement to arbitrate the claims in the District of Columbia."  Exhibit O, Judge Walton's

Order in Brown v. Dorsey & Whitney dated June 12, 2003.  While the Defendant's

Motion to Dismiss was indeed granted, the outcome was still favorable to the Plaintiff as

the original arbitration agreement prohibited punitive damages and required Plaintiff to

go to Minnesota for arbitration.

For the second case, Defense Counsel stated: "*Berry v. Soul Circus, Inc.*, 189 F.

Supp. 2d 290 (D. Md. 2002) was transferred to the Northern District of Georgia because

of a forum selection clause in Plaintiff's employment contract.  Pacer records show that

after the transfer to Georgia, the court struck Jimmy Bell's appearance as counsel for failure to comply with the local rules, and the action was later dismissed with prejudice by Plaintiff." Petition for Attorney's Fees, p. 11. In this action, Plaintiff Fred Berry, popularly known for his performance as "Rerun" from the hit comedic sitcom "What's Happening" sued Soul Circus for illegally using his likeness and image in media advertising. While Berry was hired as a general circus performer, he was performing as "Rerun." What Defense Counsel interestingly failed to tell this Court is that while Attorney Bell's appearance as counsel was stricken, there was absolutely no reason for Attorney Bell to fly down to Georgia because this case was settled.

For the third case, Defense Counsel stated: "In *Lynch v. West Group*, 2003 U.S. Dist. Lexis 20709 (2003), Pacer records show that the Plaintiff named and served the wrong Defendant, obtained an entry of default against the wrong Defendant, then failed to serve the correct Defendant within 120 days. The case was dismissed without prejudice." Petition for Attorney's Fees, p. 11. Defense Counsel's statements completely mischaracterize the occurrences in this action. Although Defense Counsel claims to have reviewed the Pacer records, Defense Counsel apparently did not review Plaintiff's Motion for Reconsideration or the Judge's subsequent Order pertaining to that Motion. Specifically, Plaintiff brought to the Court's attention the fact that Defendant referred to itself as West Group on its own letterhead, on its own fax cover sheets, and in its own e-mail addresses. As such, the Court reversed its original decision to have Plaintiff pay any attorney's fees. Moreover, the lawsuit was re-filed against West Publishing Corporation and a trial date was recently set for March 1, 2005, by the same Judge who had the prior case.

For the fourth case, Defense Counsel stated: "In *Brown v. District of Columbia*, 251 F.Supp. 2d 152 (D.D.C. 2003) the court granted a motion for summary judgment in favor of Defendant on all causes of action. The published opinion shows a myriad of defects in Plaintiff's pleadings. See Id. at 163-164. As in this case, the Plaintiff failed to allege any facts to support her allegation that Defendant and its agents conspired against her motivated by discriminatory animus." What Defense Counsel failed to tell this Court is that Attorney Bell did not originally file this lawsuit on behalf of the Plaintiff. Plaintiff fired her original lawyer, against whom a Bar complaint was filed. Attorney Bell began work on this case almost two years after Plaintiff's first attorney had filed the lawsuit. A cursory review of Pacer records reveal that Plaintiff had other counsel prior to Attorney Bell entering his appearance.

For the fifth case, Defense Counsel stated: "In *Martin v. Mendoza*, 20 F.Supp.2d 665 (D.Md. 2002) the court granted summary judgment for Defendant. Among the defects in Plaintiff's case noted in the published opinion are: Plaintiff did not have diversity jurisdiction, 230 F.Supp.2d at 667 n.2; the facts alleged did not show a Fourth Amendment violation, especially given the qualified immunity doctrine, Id. at 670-71; and Plaintiff failed to support the claims for excessive force and Equal protection violations." While the Court's ruling was unfavorable to the Plaintiff, the Plaintiff presented evidence to the Court which substantiated Plaintiff's claims of assault and battery. Specifically, in Plaintiff's deposition of the named defendant, Officer Mendoza, the defendant admitted that he was not following any policies or procedures in placing his hands on Plaintiff Martin. Attorney Bell asked: "When you grabbed him to escort him out, you weren't following your general orders, were you? Deposition of Officer

Mendoza, p. 83, lines 3-5.  To which Officer Mendoza responded: "To place my hands

on him, no."  Id. at  83, lines 9-10.  Moreover, the defendant stated that Plaintiff Martin

did not fall into any of the categories under which the officer was trained to place his

hands on an individual.  Officer Mendoza was specifically asked by Attorney Bell: "So

from the policy and procedures you just articulated, he falls under none of those

categories; isn't that correct?"  Id. at 82, lines 10-12.  To which Officer Mendoza

responded: "That is correct."  Id. at 82, line 13.  Officer Mendoza then went on to admit

that he had no right under his general orders to place his hands on an individual who was

not under arrest.  Officer Mendoza was asked: "Based on your general orders, did you

have a right to place your hand on someone who was not arrested?"  Id. at 75, lines 16-

18.  Officer Mendoza replied: "No, sir."  Id. at 76, line 6.  Neither at the time that Officer

Mendoza violently pushed and shoved Plaintiff Martin into the Metro manager's door nor

at the time that Officer Mendoza grabbed Plaintiff Martin by the elbow to escort him out

of the Metro station was Plaintiff Martin under arrest.  Despite the evidence presented,

the Court chose to rule against the Plaintiff on summary judgment, a decision over which

the Plaintiff had no control.  Moreover, Defense Counsel failed to tell this Court that the

Plaintiff's state law claims were dismissed without prejudice, leaving Plaintiff free to

bring those state law claims in state court.

For the sixth case, Defense Counsel stated: "*Saunders v. Baltimore County*, 163

F.Supp.2d 564 (D.Md. 2001) was dismissed for failure to state a claim upon which relief

could be granted.  ('The Plaintiff does not demonstrate either that he was actually

disabled under the ADA, or that his employer, Baltimore County, regards him as

disabled.')  Id. at 567.  What Defense Counsel failed to tell this Court is that the Equal

Employment Opportunity Commission made a finding of discrimination against Baltimore County based on the ADA. While the Court may have disagreed with the EEOC's findings, it is undisputed that the Plaintiff's lawsuit was validated by the EEOC's own investigation and findings, and could clearly not be categorized as frivolous.

Defense Counsel's statement that "[t]hese cases 'indicate a pattern of knowingly bringing groundless actions,' " is clearly without any basis in truth or fact. Moreover, and probably most importantly, Plaintiff's Counsel has never been sanctioned for any reason or held in contempt of court for any reason. Defense Counsel cannot point to any case where Plaintiff's Counsel was ever sanctioned by any judge because Plaintiff has never been sanctioned in any court in this country.

Plaintiff's Counsel questions why Defense Counsel failed to discuss the case of Morris, et al. v. Kaiser Foundation, et al., 8:02-cv-01468-PJM (U.S. District Court for the District of Maryland), in which Plaintiff's Counsel resolved the first Anthrax lawsuit in the United States involving the death of a federal postal worker, which was the first Anthrax lawsuit filed in the United States.

Curiously, Defense Counsel also chose not to discuss the case of The Estate of Hakim Farthing v. Okie Dokie, Inc., 1:02-cv-01936-CKK (U.S. District Court for the District of Columbia), in which a United States Park Police Officer was struck and killed by an underage patron of the Dream nightclub who had been allowed to enter the establishment, buy and consume alcohol, and leave the establishment in an intoxicated state. Neither did Defense Counsel inform this Court that this case had been settled.

Defense Counsel also chose not to discuss the case of Mitchell v. Glendening, 1:02-cv-00602-WMN (U.S. District Court for the District of Maryland), in which Attorney Bell was the first to file a lawsuit against then Governor Paris Glendening alleging that the Governor's 2002 Redistricting Plan violated the rights of African-American voters, as guaranteed under the 1965 Voting Rights Act. Neither did Defense Counsel tell this Court that in June of 2002, the Maryland Court of Appeals invalidated the former Governor's Redistricting Plan and redrew the map for the forty-fourth (44th) District in a way that added more African-American Senate and House of Delegate seats, which was the subject of the Plaintiff's lawsuit.

Defense Counsel also chose not to discuss the case of Burgess, et al. v. Glenarden, et al., 8:02-cv-02846-DKC (U.S. District Court for the District of Maryland), in which the Plaintiffs filed suit against the City of Glenarden and Herbert Jackson, former City Manager for the City of Glenarden, for sexual harassment. Neither did Defense Counsel tell this Court that this lawsuit was settled and that every employee of the City of Glenarden is now required to be trained in sexual harassment.

Defense Counsel also chose not to discuss the case of Hunt, et al. v. Sky Club Zanzibar on the Waterfront, 1:02-cv-01702-HHK (U.S. District Court for the District of Columbia), in which the Plaintiff was subjected to excessive force by Defendant's security guards. Defense Counsel further chose not to inform the Court that this case was settled.

Defense Counsel also chose not to discuss the case of Joppy, et al. v. D.C. Government, et al., 1:02-cv-00003-RBW (U.S. District Court for the District of Columbia), in which Plaintiff alleged excessive force and police brutality. Neither did

Defense Counsel inform this Court that this case was dismissed with prejudice because it was settled.

Defense Counsel further chose not to discuss the case of Cole v. Doe, et al., 1:04-cv-00022-GK (U.S. District Court for the District of Columbia), in which Attorney Bell represented the two unnamed Defendants for counts of assault, battery, and intentional infliction of emotional distress for the alleged actions of Defendants' unidentified employee. Neither did Defense Counsel mention the fact that Attorney Bell's Motion to Dismiss was granted by the Court for failure to prosecute.

Attorney Bell has also been involved in numerous state court cases. One such historical case is Kappa Alpha Psi, et al. v. Robert Jenkins, originally filed as 1:02-cv-00643-TPJ (U.S. District Court for the District of Columbia), but subsequently transferred to the Superior Court for the District of Columbia. Attorney Bell represented the named defendant in this action which alleged that the named defendant and twenty-one (21) other defendants had breached its contract with the named plaintiff, and sought a judgment of thirty-five million dollars ($35 million). The judge in this case granted Attorney Bell's Motion for Summary Judgment against the plaintiffs on behalf of all of the defendants. The judge is further allowing Defendant Jenkins' ten million dollar ($10 million) counterclaim to be tried before a jury in 2005. The second mediation on the counterclaim is scheduled for June 24, 2004.

As can be ascertained from a cursory review of Pacer records and state court files, Plaintiff's Counsel clearly does not have a "pattern of similar abuse in all of his reported cases" as falsely alleged by Defense Counsel.

**V.    PLAINTIFF'S FINANCIAL STATUS IS IRRELEVANT TO
       DETERMINING WHETHER OR NOT PLAINTIFF SHOULD BE
       ORDERED TO PAY DEFENDANT'S ATTORNEY'S FEES.**

In the Petition for Attorney's Fees, Defense Counsel stated:

> The relative financial positions between the Plaintiff and
> the Defendant here are the reverse of the usual civil rights
> case scenario.  In his pleadings Plaintiff brags about his
> financial success as the owner of the largest gentleman's
> club on the East Coast.  Defendant, on the other hand, has
> lost almost everything he owned during the course of the
> criminal proceedings against him in federal court, and his
> attorneys fees in this case have consumed a substantial
> portion of his remaining assets. P. 3.

While Defendant would have this Court believe otherwise, a claim of discrimination is

not impacted by the financial status of the plaintiff or defendant.  If that were the case, a

mom and pop store could not be held liable for discriminating against a person possessing

the financial status of Bill Cosby or Oprah Winfrey.  While it is irrelevant to the

determination of this issue, Defense Counsel failed to inform this Court that Defendant is

the owner of the building across from the Ritz Cabaret, the sale of which was the subject

of this lawsuit.  Defense Counsel further failed to remind this Court that the Defendant is

in prison for his own actions of money laundering.

Moreover, Defendant states that during the deposition of Defendant, "attorney

Bell ignored the Court's warning about the narrow scope of discovery, and instead asked

Lee questions dealing with Eichelberger and his letters, other property Lee owned, and

matters dealing with the state defamation counts."  Petition for Attorney's Fees, p. 16.

Apparently, the Defendant is not familiar with the Federal Rules of Civil Procedure

which state: "Parties may obtain discovery regarding any matter, not privileged, that is

relevant to the claim or defense of any party…Relevant information need not be

admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

Furthermore, in claiming Plaintiff's suit to be frivolous, Defendant fails to disclose what this Court already knows, that Plaintiff's Counsel specifically asked the Defendant if he was authorized to sell the Ritz Cabaret and the Defendant answered in the affirmative. In fact, Defense Counsel falsely contends that Plaintiff's counsel "neglected to ask [Defendant] the one question which this court had left open for discovery – whether [Defendant] was authorized by the federal government to sell the Ritz Cabaret on its behalf" and that "[t]his shows bad faith and an improper purpose." Petition for Attorney's Fees, p. 17. However, the record shows differently. Plaintiff's Counsel specifically asked Defendant: "So you actually signed a contract to sell the club." To which Defendant answered: "I did." Exhibit P, Deposition of Francis Lee, p. 31, lines 1-3. Plaintiff's Counsel further asked: "You signed a contract to sell Phillip Bass, with Gabne and Dennis Alvioni. You signed a contract with them to sell the club for $1.6 million; is that correct?" To which Defendant stated: "That's correct." Id. at p. 34, lines 3-7. Defendant was further asked by his own counsel: "Were these contracts or offers that you got from the – from – I can't think of the – Phillip Gabne or Mr. Dennis, were those binding on the government?" To which Defendant responded: "Yes." Id. at p. 42, lines 9-13.

When questioned as to his knowledge that Plaintiff had made an offer to Defendant's agent for $1.6 million, Defendant admitted that he was made aware of that offer by his girlfriend Linda Buck, and stated: "She stated that she got that offer from Mr. George Eichenberger [sic], the offer, like 1.6, I believe." Id. at p. 28, lines 16-18. Given

these statements by the Defendant, it was more than reasonable for Plaintiff to conclude that Defendant had authority to sell the Ritz Cabaret as he signed an agreement with another party to do just that.  In fact, Defendant accomplished just what the affidavits of Nicole Fuoco and Megan Mattson contended that the Defendant wanted to accomplish, and that was to prevent the Plaintiff from purchasing the Ritz Cabaret.

Defense Counsel further failed to remind this Court that the Defendant was the person negotiating with Plaintiff Hunt and who then signed a document selling the Ritz Cabaret to a person besides Plaintiff.  There was no other purpose for the meeting between Plaintiff Hunt and Defendant besides the negotiation of the sale of the club. While the Defendant claims that the Plaintiff's suit was frivolous, Defendant has provided this Court with no legitimate non-discriminatory reason for denying Plaintiff the ability to buy the Defendant's business when his offer was more favorable to the Defendant than the offer the Defendant agreed to.  In fact, the Declaration of Leonard Briskman stated: "Mr. Lee did solicit written offers to purchase the Ritz Cabaret, which he passed on to me."  Exhibit Q, Declaration of Leonard Briskman, p. 2.  Mr. Briskman further stated that the government "notified all of the potential buyers who had submitted written offers on the Ritz Cabaret that they would have to bid on the property online."  Id. Curiously, none of Plaintiff's offers were passed on to Mr. Briskman.  Therefore, based on the fact that none of Plaintiff's written offers were forwarded to the government by the Defendant and the fact that Plaintiff was never notified that he would have to submit a bid online, it was not unreasonable for the Plaintiff to conclude that Defendant declined to sell the Ritz Cabaret to Plaintiff due to his race.

Furthermore, the fact that this Court failed to see Plaintiff's point of view does not make Plaintiff's claims frivolous. Plaintiff continues to believe that he was defrauded by Defendant, and Defendant is now seeking to benefit from his fraudulent action through Defense Counsel's Petition for Attorney's Fees.

## **CONCLUSION**

As Defendant has failed to comply with Rule 109 of the U.S. District Court for the District of Maryland and Fed. R. Civ. P. 11, and further failed to prove that Plaintiff's lawsuit was frivolous, unreasonable, groundless or brought in bad faith, Defendant's Petition for Attorney's Fees should be disregarded by this Court.

WHEREFORE, for the foregoing reasons, Plaintiff Ron Hunt respectfully requests that this Court deny Defendant's Petition for Attorney's Fees.

Respectfully submitted,

_____
Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, MD 20772
(301) 599-7620
(301) 599-7623 (Fax)
Counsel for Plaintiff
Bar No. 14639

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **RON HUNT** | : | |
| Plaintiff, | : | Civil Action No: L02-CV-2523 |
| | : | (WDQ) |
| v. | : | |
| | : | |
| **TRACEY'S INC. t/a** | : | |
| **RITZ CABARET** | : | |
| | : | |
| and | : | |
| | : | |
| **FRANCIS LEE** | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

Upon consideration of Defendant's Petition for Attorney's Fees, Plaintiff's

Opposition thereto, and in the interests of justice, it is this _____ day of _____,

2004,

ORDERED, that Defendant's Petition for Attorney's Fees is hereby DENIED.

_____
WILLIAM D. QUARLES, JR.
U.S. District Court Judge