IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RON HUNT | ) |
|     Plaintiff, | ) |
|     v. | ) Case No. 02-CV-2523 |
| TRACEY'S INC., t/a/ RITZ CABARET | ) |
|     and | ) |
| FRANCIS LEE | ) |
|     Defendant. | ) |

**DEFENDANT'S MEMORANDUM IN REPLY TO
PLAINTIFF'S OPPOSITION TO PETITION FOR ATTORNEY'S FEES**

Throughout his Opposition to the petition for attorney's fees, Plaintiff continues to press claims that are not supported by the facts and the law.

Plaintiff repeatedly characterizes Joerg Eichelberger as Defendant's agent (Opp. pp. 1, 14) and even as his attorney (Opp. p. 15). There is no evidence that Eichelberger ever was an attorney. As Defendant has showed, Eichelberger was not and could not be Defendant's agent. See Dkt. # 63, p. 3. Furthermore, undisputed evidence showed neither of them were agents of the federal government, the crucial issue here. Mem. Op., 4/28/2004, Dkt. # 64, p. 5.

Plaintiff also persists in claiming that "Defendant entered into a contract of sale with a non-African American..." Opp. pp. 2, 31. He claims that "Defendant has provided this Court with no legitimate non-discriminatory reason for denying Plaintiff the ability to buy the Defendant's business," Opp. pp. 13, 31 – despite the Court's implicit ruling that the Defendant

could not sell the business because it had been forfeited to the government. Mem. Op. 4/28/2004, Dkt. # 64, p. 2; Mem. Op. 7/21/2003, Dkt. # 35, p. 1.

Plaintiff also mis-characterizes what Lee said in his deposition, by taking excerpts out of context. Opp. pp. 30 - 31. Lee is a Vietnamese immigrant with a very poor command of English, especially legal terminology. A fair reading of his deposition shows he did not know the difference between a contract and an offer, or what "binding on the government" meant. But he made it clear hat he could not sell the club because he did not own it any more.

## ARGUMENT

**I.   Plaintiff's arguments regarding the case law miss the point**

*Arnold v. Burger King Corp.*, 719 F.2d 63 (4th Cir. 1983), cited by Plaintiff on p. 2, actually helps Defendant. It held that a lawsuit was frivolous where the record was devoid of any credible evidence of racial animus. The same is true here.

It is not necessary that this court have previously made a finding that Plaintiff's claims were groundless, frivolous, unreasonable or made in bad faith," as Plaintiff suggests on page 3. The Court can make that finding now. Bad faith is not required under § 1988. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978).

*Harshbarger v. Prof'l Evaluation Group, Inc. (In re: Jack L. Gould)*, 77 Fed. Appx. 144 (4th Cir., 2003), cited by Plaintiff on page 4, is an unpublished opinion. Fourth Circuit Local Rule 36(c) states that citation of unpublished decisions is "disfavored" in district courts within the Fourth Circuit. When citing an unpublished opinion, the rule requires a copy of the decision be attached to the motion. Plaintiff failed to do so. An unpublished decision may not be cited unless it "has precedential value in relation to a material issue in the case and there is no

published opinion that would serve as well." L.R. 36(c). Again plaintiff violated the rule. *Gould* is not on point. It involved contempt proceedings against two attorneys for introducing prejudicial evidence which the court had previously excluded. The Fourth Circuit held that Schewe was not given notice of the motion for attorney's fees because the oral motion named Plaintiff's counsel, but did not specify which one, and the court's order from the bench only mentioned Attorney Gould. As a result, plaintiff's written memorandum only presented arguments against sanctioning Gould. Schewe attended and testified at the sanctions hearing, but had no notice that the district court was considering sanctions against him. *Gould*, Exhibit 1, at 160-61. Here, Plaintiff only has one counsel, and was given notice and the opportunity to file his memorandum opposing fees.

*In re: Kunstler (Kuntsler v. Britt)*, 914 F.2d 505 (4th Cir. 1990), cited by Plaintiff on page 4, is also distinguishable on the lack of notice claim. There, the court heard arguments on the request for Rule 11 sanctions and then directed defendants to submit their itemization of fees and expenses. Without allowing plaintiff's counsel to respond to the amount of the fees, the district court awarded the full amount of the fees. On appeal, the case was remanded to give plaintiffs' counsel that opportunity to challenge the amount of fees claimed. Here, Defendant has already submitted itemizations of his attorneys' fees and expenses. Plaintiff's counsel has chosen not to address them yet, but he has the opportunity to do so.

Neither of the above cases dealt with LR 109 – nor anything like it. Defendant addresses the local rule below in section IV.

On pages 4 and 5, Plaintiff makes frivolous arguments about *Blanchard v. Bergeron*, 489 U.S. 87 (1989) and *Hensley v. Eckerhart*, 461 U.S. 424 (1983). Defendant quoted those two

leading cases for their general black letter law on § 1988 attorney's fees awards.  Plaintiff tries to distinguish them *on their facts!*

**II.     This Court's ruling on the Rule 12(b) Motion does not exonerate Plaintiff**

Plaintiff argues that if his case was groundless, this court would not have extended discovery.  Opp. p. 6, 18.  This misconstrues the nature of a ruling on a Rule 12(b) Motion to Dismiss.  A court ruling on a Rule 12(b) motion is required to view the *allegations* in the light most favorable to the plaintiff.  At that stage there is no way of knowing what *evidence* a plaintiff might have which he has not yet revealed.

Determining whether Plaintiff filed his lawsuit knowing it was groundless requires the court to assess the quality and quantity of *the evidence which the plaintiff had or believed he had at the time of the filing of his complaint*.  Until Plaintiff filed his opposition to summary judgment, there is no way this Court, nor Defendant, could have known that Plaintiff had no evidence of agency nor of the crucial element of racial animus.

**III.    Plaintiff knew or should have known his suit was groundless before filing it**

Plaintiff argues he did not file suit knowing it was groundless,

> given the fact that Plaintiff had affidavits, letters, a signed contract, and the testimony of Defendant himself which tended to support Plaintiff's claims of contractual discrimination based on race.

Opp. p. 3.  Those items do not support Plaintiff's claims.

Plaintiff did not have Defendant's testimony until Lee's deposition on November 19, 2003 – 16 months after Plaintiff filed suit. Furthermore, Defendant's deposition refutes rather than supports Plaintiff's claims.

A.     Racial animus

Plaintiff's affidavits, letters and "a signed contract" fail to provide *any* evidence supporting racial animus.

On pages 9 - 11 of his Opposition, Plaintiff offers long quotes from declarations from two of Defendant's employees, claiming these detail "specific discriminatory statements." However, there is nothing vaguely racial in any of those statements. Nothing in Plaintiff's declaration, quoted on pages 12 - 13, describes actions or comments by Lee suggesting a racially discriminatory tendency or motive. Instead Plaintiff's own evidence suggests Lee did not like Hunt because he thought Hunt was cocky, arrogant, and tended to "throw his money around" in order to impress and manipulate people.

Plaintiff has not suggested how the Eichelberger letters tend to prove racial animus.

Plaintiff suggests on page 13 that Lee's purported signature on the Gagne "contract" proves Defendant racially discriminated against Hunt merely because the prospective buyer was a Caucasian.

Putting aside for a moment the facts that this could not legally be a contract, given the circumstances,[1] and that the document is not authenticated, and the signature does not look at all like Francis Lee's[2] – if Lee had signed a contract with a Caucasian man, that, statistically, would not prove racial discrimination. The likelihood that the next person making an offer would be white was greater than 50/50.

---

[1] This document could not be a valid contract, since Lee was not the owner, and the signature line lists Francis Lee as "President, Seller" not agent for the federal government.

[2] Compare Lee's notarized signature on his deponent's certificate, Exhibit 2.

**B.     Agency**

Plaintiff's affidavits, letters and "signed contracts" similarly fail to provide any credible evidence of agency.

On page 12, Plaintiff quotes his own affidavit, stating that Lee told him "that the federal government was allowing him to sell the Ritz Cabaret in order to settle his debts." That is the closest Plaintiff comes to proffering any admissible evidence on this point. The problem is, that is not credible evidence given the other information known and/or available to Hunt and his attorney. Both of them knew Lee was a Vietnamese immigrant who spoke broken English and was naive about legal affairs. Whatever Lee may have said to them, or how they interpreted it, they knew Lee had recently been convicted and the club had been forfeited. This is a situation where a reasonable person would ask questions.

It appears from plaintiff's evidence that Plaintiff's lawyer, Jimmy Bell, was present during the meetings between Hunt and Lee. No lawyer would reasonably believe – without bothering to check – that the federal government would authorize the convicted defendant to sell forfeited property. Obviously, Plaintiff and his lawyer willfully blinded themselves to the law and facts available to them.

Contrary to Plaintiff's argument on page 14, the Gagne offer does not lend credence to Hunt's theory that Lee was authorized to act as agent for the government. Although purporting to be signed by Francis Lee, Lee is listed as "President, Seller" – not "agent for the U.S. government." The document does not mention the fact that the property was owned by the federal government, nor that it had been forfeited. Any reasonably prudent lawyer who knew

Francis Lee had been convicted and the property forfeited would question the validity of this document.

Furthermore, the letters of Eichelberger negate, rather than buttress, Plaintiff's claim that he reasonably believed Lee was authorized to act as agent for the federal government. See Letter from Eichelberger dated April 5, 2002: "we have to submit the offer to the Fed's for the final approval." In the May 28, 2003 Eichelberger letter, he begins: "[s]ince the Federal Government has seized the Ritz...." Then he explains "[t]he way it works is the same as I told you before, any legit *contract* [sic]$^3$ is forwarded to the Federal Government." Then the federal government "will investigate the person or group to see if there [sic] are *qualified* to purchase the Ritz." *Clearly, if the federal government must determine whether the offeror is qualified to buy it, then Lee did not have the authority to bind the federal government.*

Eichelberger explained that it's like an auction – "the best party qualified wins the bid." Clearly this language informed Plaintiff that the federal government owned the property and made the decision who to sell it to, and that any documents Lee signed would not be binding on the federal government.

Plaintiff cannot take refuge behind his mis-interpretations of gerrymandered fragments from Eichelberger's letters. As vague, imprecise and factually incorrect as these letters were, there was enough information presented to put Plaintiff on notice of the legal effect of the forfeiture. If Plaintiff and his counsel still had questions they should have contacted the U.S. Attorney's Office or Marshal Service.

---

$^3$ From the context it is obvious he meant "offer."

**IV.     Quarterly statements under Local Rule Appendix B should not be required here**

On Opp. pages 6 - 8, Plaintiff argues that Defendant failed to comply with the quarterly statement requirement of Local Rule Appendix B.

Although Defendant did not comply with that procedure, under the circumstances his failure to comply should be excused.

The local rule Appendix B requirement that parties who anticipate requesting statutory attorney's fees at the end of litigation give notice as the fees mount up, in the form of quarterly copies of the attorney fee bills.  Such a requirement might make sense for plaintiffs attorneys in civil rights suits, for they are presumed to be entitled to attorney's fees if they prevail.  *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968).

In contrast, prevailing defendants are only entitled to attorney's fees if they can show the suit was *vexatious, frivolous, unreasonable or without foundation*.  Prevailing defendant requests under this stringent standard are rare.  Making such a claim against a litigant and his counsel is not something done lightly.

Here, until recently, Defendant had no proof that plaintiff had filed his suit without a sufficient factual foundation.   The motion for summary judgment forced Plaintiff to put all his evidence on the table.  Until then, Defendant did not know what evidence Plaintiff had.

Defense counsel knew Plaintiff could not prevail on the issue of agency given the declarations of AUSA Martin Clarke and Marshal Service employee Leonard Briskman.  But the Plaintiff did not have the benefit of these declarations when he filed his case.  Defendant did not want to prematurely jump to the conclusion that plaintiff's counsel filed the complaint without a

factual basis for showing agency.  It was conceivable that Plaintiff had some other, undisclosed evidence that reasonably led him to Lee was authorized to act as an agent.

Defendant's proof that the complaint was filed without a factual foundation arrived in the form of Plaintiff's Opposition to Summary Judgment, filed 4/12/2004.  Defense counsel filed their itemizations of their attorney's fees on 5/12/2004.  Appendix B only requires that attorney's fees statements be filed quarterly.  Defendant promptly filed his motion for fees and itemization promptly after acquiring proof of a sufficient factual basis for prevailing defense attorney's fees under § 1988.  The purpose behind the Appendix B procedure was served.

Furthermore, when the local rule clashes with the principles behind § 1988, the local rule must give way.

> A local rule must be both constitutional and rational, and its subject matter must be within the ambit of the court's regulatory power. In this same vein, a local rule must be consistent with, but not duplicative of, Acts of Congress and nationally applicable rules of practice, procedure, and evidence. Even if a local rule does not contravene the text of a national rule, the former cannot survive if it subverts the latter's purpose. Then, too, local rules should cover only interstitial matters. They may not create or affect substantive rights or institute "basic procedural innovations."

*Stern v. United States Dist. Court*, 214 F.3d 4, 13 (1st Cir., 2000) (citations omitted).

The purpose of § 1988 fees for prevailing defendants is to deter frivolous and baseless discrimination suits.

Determining whether a plaintiff has a basis in law and fact to support his claims requires knowing what evidence plaintiff has.  Rarely, if ever, would defense counsel learn that plaintiff brought suit without adequate evidentiary foundation – until well into discovery, during summary judgment, or even during trial.  Under the circumstances it would violate the purpose of § 1988

defense fees to hold that non-compliance with Appendix B, prior to learning of grounds for defense fees, precluded a defendant's fee award.

## V.     Plaintiff's notice argument

Plaintiff claims, at Opp. pages 7 - 8, that he was not given notice of defendant's intention of pursuing sanctions.  Ms. Grantland warned Mr. Bell in a letter dated August 8, 2003:

> As I have pointed out several times, your civil suit is frivolous.  You have filed pleadings and motions without researching your issues, and have crossed the Rule 11 line on several occasions.  I do not believe in nuisance suits, and will not condone a payment of money to settle one.  If you continue to conduct this litigation in such a manner I will seek sanctions.

Exhibit 3, p. 2.

Plaintiff argues that Defendant failed to comply with Rule 11(c)(1), which requires that the motion for sanctions shall not be filed with the court unless the opposing party receives notice of "the challenged paper, claim, defense, contention, allegation or denial" and allowed 21 days to withdraw or correct it.  Since the challenged paper here is the plaintiff's entire complaint, Plaintiff would have to dismiss his case in order to withdraw or correct the challenged paper.

Although not designated as a motion, Ms. Grantland's August 8, 2003 letter to Mr. Bell gave all the notice that was required under Rule 11(c)(1).  It provides Plaintiff the names and phone numbers of the federal agents in charge of the forfeiture case and states that they "would know better than anyone that the federal government never gave Lee authority to enter into a binding contract to sell the Ritz Cabaret." Id. p. 1.  The letter also lays out the legal hurdles to deposing an inmate, the trouble and expense it would entail, and warns that deposing Lee would be a waste of time.  Finally it warns Mr. Bell that he must not continue conducting litigation in such a manner or Defendant would seek sanctions.

Despite these warnings, Plaintiff plowed ahead. Plaintiff ignored the court order limiting discovery to the agency issue (Mem.Op. 7/21/2003. Dkt. # 35 p. 1). The only discovery Plaintiff obtained was the prison deposition of Francis Lee – where he asked about everything but agency. He made no attempt to depose the government agents.

Even after abandoning any pretense of looking for evidence of an agency connection during discovery, Plaintiff did not dismiss his case.

**VI.    Plaintiff's counsel should be required to pay a portion of the fees**

Plaintiff claims in Part IV, pages 19 - 28 that Defendant's citation to material on plaintiff's counsel's website and citation to his reported cases "is a blatant attempt to tarnish plaintiff's counsel's reputation with falsities and untruths." Opp. p. 19.

Mr. Bell's website and his cases which are reported on Lexis speak for themselves, and Defendant stands behind his characterization of them. Defendant did not mean to imply that Bell was *not* "a prominent civil rights lawyer" as plaintiff claims. By holding himself out this way, however, Bell is actively soliciting clients who want to sue for racial discrimination. Because it appears that Bell is not adequately screening his cases before filing suit, his self-promotion increases the dangers of future lawsuits filed without factual basis.

On pages 21 and 28, Plaintiff quibbles with the term "reported decisions" and implies that, by selecting only cases reported in Lexis, defense counsel ignored the majority of Mr. Bell's "reported decisions" which were available on Pacer.

As a term of art in the legal community, "reported decision" generally means opinions reported in the West Publishing or Lexis system. Mr. Bell talks of his cases listed on Pacer. Pacer is a new system containing the court records on all cases filed after the Pacer system was

implemented. If there is a way to search the Pacer database by attorney name, Defendant was not aware of it.

District court opinions are reported on Lexis only when the court deems the decision important enough to be of concern. A Lexis search is a quick way of zeroing in on an attorney's most important cases. Mr. Bell's cases reported on Lexis show an alarming number of instances in which Bell was criticized for filing federal complaints despite some glaring defect he should have seen before filing suit. Lexis reports only six federal cases in which Bell was attorney of record. Of these six, all showed problems.

As Defendant detailed on pages 11 - 13, one was dismissed because the employment contract required binding arbitration; another was transferred because of a forum selection clause in the contract; and plaintiff named and served the wrong defendant in another. In the remaining three, the district court judges published fairly lengthy opinions criticizing Mr. Bell's work, noting numerous missing elements in his causes of action, and the lack of a factual basis to support many of his claims. This suggests a dangerous pattern of filing cases without adequate investigation and legal research.

Mr. Bell's list of commendations and credentials on pages 20-21 does not diminish the fact that in his six federal cases listed on Lexis he has seemingly filed complaints lacking an adequate basis in law and/or fact. Even the most prominent lawyers can commit violations of Rule 11 or § 1927. See e.g. *In Re Kunstler*, 914 F.2d 505 (4th Cir. 1990). However, that does not make such behavior acceptable.

On pages 21 - 26, Plaintiff explains what happened in Bell's reported cases. On page 22 he states that in *Brown v. Dorsey & Whitney*, 267 F.Supp.2d 61 (D.D.C. 2003), although the case

was dismissed because the arbitration agreement required binding arbitration, by filing this federal complaint, he was able to leverage his client into a settlement, in which the policy banning punitive damages in arbitration was waived and the claims were arbitrated in D.C. rather than the state specified in the arbitration clause. Although that was a victory for Mr. Bell and his client, this shows Bell was able to obtain something to which he was not otherwise legally entitled by filing a defective federal complaint. That is not a virtue.

In *Berry v. Soul Circus, Inc.*, 189 F.Supp.2d 290 (D.Md. 2002) Bell notes he was able to settle the case after the transfer to Georgia, where the court had jurisdiction under the contract's forum selection clause. Again, that was a victory for Bell and his client, but they needlessly multiplied the proceedings by requiring the defendant to litigate in the wrong federal court prior to obtaining transfer.

Similarly *Lynch v. West Group*, 2003 U.S. Dist. Lexis 20709 (D.C. 2003) required the wrong defendant to litigate against plaintiff before obtaining dismissal – again needlessly multiplying proceedings.

Plaintiff's assertion that Mr. Bell was not the original attorney for plaintiff in *Brown v. District of Columbia*, 251 F.Supp.2d 152 (D.D.C. 2003), does not absolve him. When he took over the case Mr. Bell had a duty to ascertain that the complaint had a reasonable basis in law and fact – especially since a bar complaint was filed against the prior attorney. See Opp. at 24.

Finally, Plaintiff argues that Mr. Bell achieved some degree of success in *Martin v. Mendoza*, 230 F.Supp.2d 665 (D.Md. 2002) in that the court dismissed the state law claims without prejudice. He ignores the fact that the defendant was forced to litigate against him before all of the federal claims were dismissed, again needlessly multiplying litigation.

13

Plaintiff argues on page 25 that the EEOC's finding of discrimination prior to litigation in *Saunders v. Baltimore County*, 163 F.Supp.2d 564 (D.Md. 2001) was enough to prevent his case from being categorized as frivolous. Even if that were true, the court's opinion shows a series of errors and defects that multiplied the proceedings for the defendant.

Plaintiff's counsel's itemization of his other lawsuits listed on Pacer – which he claims were successful – does not negate the pattern illustrated in the six decisions reported on Lexis. It does not matter that lawsuits filed without a sufficient basis in law and/or fact represent a small percentage of his cases. Frivolous pleadings are not supposed to be filed at all.

The fact that cases settled does not prove plaintiff had a factual and legal basis before filing suit. Unfortunately, litigants today often find it more economical to settle than to litigate, even if they know a plaintiff's claims are frivolous.

## VII. The financial status of the parties is relevant

In part V, Plaintiff asserts – without supporting authority – that the financial status of the parties is irrelevant to a determination of a prevailing defendant's entitlement to attorney's fees. A long line of authority – including of a case Plaintiff cited in his Opposition – holds otherwise:

> In appropriate circumstances, the district court should give weight to the relative financial positions of the litigants. The policy of deterring frivolous suits is not served by forcing the misguided [civil rights] plaintiff into financial ruin simply because he prosecuted a groundless case. Indeed, fee awards that callously disregard the financial straits of a losing plaintiff would soon defeat the overarching remedial purposes of [the Civil Rights Act] by discouraging all but the airtight cases. The dual interests of equity and deterrence can be advanced without giving overriding consideration to the punitive value of a fee award, particularly when the reduced award still represents a substantial burden on the plaintiff and the defendant is fully capable of absorbing a reasonable share of its legal fees without hardship. When the plaintiff can afford to pay, however, the congressional goal of discouraging frivolous suits weighs heavily in favor of levying the full fees.

*Arnold v. Burger King Corp.*, 719 F.2d 63, 68 (4th Cir. 1983) (internal citations omitted).

## CONCLUSION

Wherefore, for the foregoing reasons, this Court should order Plaintiff to pay the full amount of Defendant's attorney's fees.

Respectfully submitted

/s/
BRENDA GRANTLAND
265 Miller Avenue
Mill Valley, CA 94941
(415) 380-9108
(415) 381-6105

/s/
DAVID ALBRIGHT
Local counsel
Bennett & Albright
200 E. Lexington St., Suite 200
Baltimore, MD 21202
(410) 727-2168

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by electronic file transfer upon Jimmy A. Bell, Law Office of Jimmy A. Bell, P.C., 9610 Marlboro Pike, Upper Marlboro, MD 20772, this 10th day of June, 2004.

/s/
DAVID ALBRIGHT